**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 93-2056
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

VERSUS

MARY JANE JENKINS, EVAN PETER PIGMAN,
JO ANN ROCHELLI, DAVID CARL STUBBS,
RICKIE HERBERT RANNEY, and LARRY WAYNE MALADY,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____
(February 20, 1995)

Before WISDOM, KING and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

The government appeals from the grant of Appellees'[1] motions to suppress evidence. For the reasons below, we find that the district court's holding was based on a misapprehension of the applicable law, and therefore we reverse, render and remand.

## I.  PROCEDURAL BACKGROUND

In April 1991, a grand jury for the Southern District of Texas indicted Appellees for racketeering and interstate shipment of obscene materials via common carrier. Appellees moved to suppress evidence obtained from five searches of bookstores and businesses

_____

[1]  Co-defendants Larry Wayne Malady, Jo Ann Rochelli and Rickie Herbert Ranney are not party to this appeal.

owned or controlled by Jenkins in Alabama, Louisiana, Missouri, Tennessee and Texas, and from the search of a vehicle owned by appellee Stubbs. These searches were made pursuant to warrants issued on probable cause, based on evidence gathered without a warrant by virtue of a cooperating witness. As will be discussed more fully below, the propriety of the search warrants is not directly at issue. Rather this appeal addresses Appellees' contention that the preliminary warrantless search--involving allegedly obscene videotapes made available by the cooperating witness--was constitutionally infirm.[2]

Following an evidentiary hearing, the district court suppressed all evidence seized as a result of the warrantless, preliminary search. The government moved for reconsideration raising for the first time the issue of the Appellees' standing to challenge the preliminary search. The district court denied the motion, and the government filed the instant appeal.

## II.  FACTUAL BACKGROUND

### A.  The Appellees

Mary Jane Jenkins, a resident of St. Louis, owned and operated Phoenix and Associates Management, Ltd., a Missouri corporation formed to manage 17 "adult" bookstores. Evan Peter Pigman, also a resident of St. Louis, worked as general manager and president of

---

[2]    We note that the validity of similar search warrants has previously been appealed to the United States Court of Appeals for the Sixth Circuit. The Sixth Circuit remanded the case to the district court for an evidentiary hearing on the exact issue presently before us. See White Fabricating Co. v. United States, 903 F.2d 404 (6th Cir. 1990).

Phoenix and Associates. Each of Jenkins' 17 adult bookstores included a "video arcade," consisting of "peep machines," that exhibited pornographic videotapes. Customers viewed the videotapes by inserting coins or tokens into the machines. White Fabricating, located in Cleveland, Ohio, owned and operated the peep machines and supplied videotapes for exhibition in the machines.

Each week, White Fabricating's regional representatives would receive videotapes shipped by White Fabricating via United Parcel Service (UPS). The White representatives would then proceed to Jenkins' stores, insert new videotapes into the machines, retrieve the prior weeks' videotapes and remove money from the machines. David Stubbs, a resident of Houston, supervised the installation of videotapes in adult bookstores throughout the south for White.

**B. The Searches**

The search warrants were executed as part of a series of multi-city searches of adult bookstores purportedly exhibiting obscene videotapes. Much of the evidence adduced at the suppression hearing was identical to evidence presented to the United States Court of Appeals for the Sixth Circuit. See White Fabricating Co. v. United States, 903 F.2d 404 (6th Cir. 1990).

As described in White Fabricating, Cleveland FBI agent Jim Larkin drafted a model "national affidavit" detailing shipments of allegedly obscene videotapes from a source in Cleveland to various adult bookstores located throughout the United States. Agent Larkin used this affidavit to obtain warrants authorizing the search of Diversified Industries and White Fabricating, the alleged

3

source of the obscene videotapes. FBI agents used portions of this affidavit to obtain warrants authorizing the search of adult bookstores that had allegedly received copies of the obscene videotapes for their peep machines.

> The affidavit asserted that the plaintiffs were involved in a pattern of racketeering activity, interstate transportation of obscene material and transportation of obscene material for sale and distribution, conspiracy to defraud the United States, money laundering, and aiding and abetting in these criminal activities. The allegations contained in the affidavit were based on a six-month investigation by the FBI which involved the plaintiffs and two other companies. The investigation disclosed a pattern of weekly shipments of allegedly obscene video tapes from Cleveland, Ohio to adult book stores and peep shows throughout the United States.

> The investigation revealed that DI [Diversified Industries] manufactured video peep show booths which were subsequently installed in adult book stores. DI also supervised regional companies that oversaw peep show operations in their various geographic areas. These service companies would receive the video tapes, place them in a video machine in a peep show booth, occasionally service the machine, keep records of profits generated from the machines, and send back to DI a certain percentage of the proceeds generated. The investigation also revealed a meticulous method of accounting for profits which included the use of locked cash boxes which required keys to open, profit and balance sheet records, extensive use of cashier's checks, and the disbursal of deposits of cash into a number of banks to avoid the $10,000 minimum reporting requirement imposed on these banks.

> White was allegedly one of DI's service companies. The investigation indicated that White was substantially engaged in the duplication, installation, and distribution of the allegedly obscene video tapes which were placed in the various peep show booths. White would first receive approximately fifteen "master" video tapes, which White would duplicate, using some one hundred video cassette recorders. White's employees would then package the video tapes for shipment to adult book stores scattered throughout the country.

4

Government agents, for five weeks, monitored the shipment of video tapes from White to a "cooperating witness," an employee or associate of one of the plaintiffs. His particular job allegedly involved receiving the shipment of video tapes from White in Cleveland, and then installing the various duplicated video tapes in adult book stores in a particular city. On approximately June 1, 1988, this cooperating individual allegedly began to allow law enforcement officials to examine the video tape cassettes and to make copies of them for subsequent viewing. The government agents viewed seventy-five different tapes, drafting detailed written descriptions of the contents of fifty video tapes.

Based on this information, along with other information allegedly supplied by cooperating witnesses, Agent Larkin concluded that probable cause existed to support the search warrants authorizing the search of the plaintiffs' premises. Written descriptions of the content of the allegedly obscene fifty video tapes were furnished to the magistrate, along with the extensive affidavit. Based on the affidavit, the fifty written descriptions, and after personally viewing four of the video tapes, the magistrate issued the warrants.

Id. at 406-07. At issue in the instant appeal is whether the Appellees' Fourth Amendment rights were violated when the government obtained access to the videotapes via the cooperating witness without a specific warrant.

During the initial stages of the investigation, FBI agents obtained permission from UPS to examine certain parcels shipped from White Fabricating to various locations. From the exterior of the parcels, the agents could ascertain their destination, but were not able to learn any information about their contents. FBI agents visited the establishments designated for receipt of the parcels, and viewed the videotapes in the same manner as an ordinary customer, i.e., by inserting coins or tokens in the peep machines.

5

This process, however, proved expensive and unworkable because the FBI was unable to link the allegedly obscene videotapes viewed to the UPS parcels, and was therefore unable to track their shipment in interstate commerce. The agents decided to recruit a cooperating witness who could permit access to the contents of the UPS shipments. After some investigation, the agents determined to approach Mark Boyd (Boyd), the sole White Fabricating employee in Memphis, Tennessee.

Two FBI agents approached Boyd and informed him that he had been identified as a possible prosecution target for interstate transportation of obscene materials. The agents asked Boyd if he would cooperate in their investigation, and he agreed. The district court did not find that the FBI promised Boyd immunity or any other incentive for his cooperation. The district court specifically found, however, that the FBI failed to apprise Boyd of his right to refuse to cooperate.

Essentially, Boyd agreed that he would continue to follow his normal routine. As usual, he picked up the White Fabricating shipment at the Paris Theater in Memphis. However, after retrieving each parcel, he met with the FBI and the local police. Boyd opened the parcels in the presence of the agents, who photographed and inventoried their contents. As set forth in the district court's memorandum opinion,

> Generally, Boyd would receive four sets, or "libraries", of 15 video-tapes on each delivery. He would provide one library of 15 video-tapes to the FBI, which included seven duplicate copies that the FBI was permitted to keep. The eight "original" video-tapes would be returned to Boyd the following morning after the

6

FBI had copied them. This procedure occurred on five occasions in June of 1988, resulting in a total collection of 75 video-tapes. Of that collection, 50 video-tapes were viewed and written reports were prepared by various FBI agents and presented to Special Agent Larkin.

Boyd was the sole employee of White Fabricating in Memphis. He received all of his instructions from management and reported directly to the Cleveland office. It is undisputed that Boyd did not have permission from his employer to provide originals and copies of various video-tapes to the FBI. Further, no dispute exists that Boyd was not the owner of the video-tapes at any time, was not a manager or owner of the company that produced the video-tapes, and that Boyd was not to reveal his agreement and conduct with the FBI to his employers. The testimony establishes that Boyd was not and has not been charged in any indictment. Special Agent Larkin further testified that he was not aware of any payment(s) made to Boyd by federal or local officials, and that he had not authorized any payment, even for reimbursement for expenses.

### III. CONSTITUTIONALITY OF THE SEARCH

Simply put, warrantless searches are per se unreasonable, and therefore unconstitutional, unless they fall into one of the few specifically established and well-defined exceptions to the general rule. See Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043 (1973). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Id. at 2043-44. The government's ability to rely upon the consent exception depends on two factors. First, the

government must show that the consent was given voluntarily. See Bumper v. North Carolina, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 1792 (1968),

When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving

7

> that the consent was, in fact, freely and voluntarily given.  This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.

(footnotes omitted).  Second, the prosecution must show that either the defendant himself consented to the search or that consent was obtained from a third party that had the ability to furnish valid consent.  See United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct 988, 993 (1974).  We will address the issues of voluntariness and authority to consent seriatim.

## A.  Standard of Review

The standard of review of a district court's ruling on a motion to suppress is well defined in this Circuit.  "We employ a two-tier standard...reviewing the district court's factual findings for clear error and its ultimate conclusion as to the constitutionality of the law enforcement action de novo."  United States v. Chavez-Villarreal, 3 F.3d 124, 126 (5th Cir. 1993).  "We consider the evidence in the light most favorable to the prevailing party when we review the granting of a motion to suppress.  The district court's factual findings are accepted unless they are clearly erroneous.  Questions of law are reviewed de novo.".  United States v. Richard, 994 F.2d 244, 247 (5th Cir. 1993).

## B.  Voluntariness of Consent

The Supreme Court has set forth the standard by which the voluntariness issue must be assessed.  See Schneckloth v. Bustamonte, 412 U.S. at 227, 93 S.Ct. at 2047-48,

> [T]he question whether consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.

We have previously enumerated six factors relevant to this "totality of the circumstances" test:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.
>
> In doing so, we have noted that "although all of the above factors are highly relevant, no one of the six factors is dispositive or controlling of the voluntariness issue."

United States v. Olivier-Becerril, 861 F.2d 424, 426 (5th Cir. 1988)(citations omitted).

The district court relied on six factors in determining that Boyd's consent was not voluntary, however, of these six factors only one appears among the list we have set forth. The first factor relied on by the district court is that Boyd was not apprised of his right to refuse to cooperate. While this factor is certainly relevant to the analysis, the district court appears to have ascribed it far too much weight.

"While knowledge of the right to refuse to consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." Schneckloth v. Bustamonte, 412 U.S. at 227, 93 S.Ct. at 2048; see also, United States v. Davis, 749 F.2d 292, 296 (5th Cir. 1985)("Proof of knowledge of the right to refuse consent is not required to show voluntariness."). The district court's reliance on authority to the contrary from the Sixth Circuit is misplaced.

9

United States v. Jones[3] is inapplicable for the very reason that the district court confesses. The Sixth Circuit concluded that, at the time of the search, Jones had been placed in custody but had not been informed of his Miranda rights. Because the court determined that Jones had in fact been arrested, and not apprised of his rights, all indicia of voluntariness were lacking. In contrast, there is no evidence that Boyd was ever taken into custody or otherwise made subject to the control of law enforcement officers. Likewise, in United States v. Grant[4] the court found that "Grant was improperly seized by the agents [and therefore], his subsequent consent to the search of his carry-on bag did not overcome the taint of the agents' prior conduct." Id. at 388.

The district court listed five other factors on which its voluntariness ruling appears to be based.

> (a) Boyd was not indicted, (b) Boyd did not have the consent of his employer to permit the FBI to inventory and copy the video-tapes and the packages' content; (c) Boyd was to keep his activities a secret and not reveal his conduct to his employer; (d) Boyd did not own any part of the business or the video-tapes; and (e) all parties knew that Boyd would be acting on behalf of the FBI in providing copies of video-tapes to the FBI.

The simple fact is that while some of these factors may be relevant to the issue of Boyd's authority to consent, none of these factors relates to the voluntariness of his consent. For example, the fact that Boyd was not indicted could also be indicative of voluntary

---

[3]    846 F.2d 358 (6th Cir. 1988).

[4]    920 F.2d 376 (6th Cir. 1990).

10

consent, because it tends to indicate a lack of coercion by law enforcement officials.

The fact that Boyd did not have his employer's consent to allow the FBI to copy the videotapes, and the fact that Boyd was to keep his activities a secret are not relevant to the voluntariness analysis because they are true in almost every confidential informant or cooperating witness situation. Despite the existence of these factors, it is beyond question that the government has the right to investigate possible illegal activity,[5] and this investigative power encompasses the right to use confidential sources.[6] Persons who engage in illegal activities involving others assume the risk that their confidences may be betrayed, and that evidence of illegality may be disclosed to law enforcement authorities. See, e.g., Hoffa v. United States, 385 U.S. 293, 301-03, 87 S.Ct. 408, 413-14 (1966).

Turning to the factors which we have determined are relevant to the question of voluntariness, we find that they, based on the record before us, militate in favor of a finding that Boyd's consent was voluntary.

### 1. Voluntariness of Boyd's Custodial Status

---

[5]    See e.g. Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539, 543-45, 83 S.Ct. 889, 892-93.

[6]    See, e.g., Lewis v. United States, 385 U.S. 206, 210, 87 S.Ct. 424, 427 (1966)("Such a rule [prohibiting the use of undercover agents] would, for example, severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest."); Pleasant v. Lovell, 974 F.2d 1222, 1232 (10th Cir. 1992)("The government has the right to use informants and to keep abreast of possible criminal activity.").

The record contained no facts upon which it could reasonably be concluded that Boyd was in any form of custodial status when he consented to cooperate.  Boyd was approached either at home or in a parking lot, there was no one other than Boyd, perhaps his wife, and two FBI agents--in plain clothes, and not displaying firearms--present, Boyd had no pending legal problems, and he was apprised that his cooperation would be strictly voluntary.  Furthermore, the record does not indicate any restrictions on Boyd's movements, and in fact indicates that Boyd continued in his normal routine throughout the period of cooperation.

## 2. Coercive Police Procedures

Likewise, the record contains no evidence of coercive police procedure.  The only fact that can even remotely be placed in this category is that Boyd was informed by the FBI that he was a potential target for criminal prosecution.  The record indicates that this statement was true, and there is no showing that the statement was made in an effort to coerce cooperation.  In addition, Boyd was also informed that his cooperation was voluntary and would not be rewarded financially or with immunity from prosecution.

Finally, there is no indication that Boyd's cooperation was immediate.  While he apparently agreed during the initial meeting to cooperate, the actual plan for cooperation was not conceived until a second meeting with the FBI, and his actual cooperation, and consent to the search, did not commence until the first time he met the FBI with a shipment of videotapes.  The lack of immediacy

12

of cooperation infers that Boyd had time to consider his decision outside of law enforcement presence, and therefore indicates a lack of coercion.

### 3. Extent and Level of Cooperation

The extent and level of Boyd's cooperation weigh heavily in favor of a finding of voluntariness. Boyd cooperated with the FBI over a period of five weeks. He met with the FBI on two occasions prior to the first shipment of videos being made available to the FBI. He picked up each of the five shipments and brought them to a predetermined location to meet with the FBI. He opened the boxes in the presence of the FBI, and permitted the FBI to retain a set of videotapes overnight for the purpose of copying them. Boyd further allowed the FBI to retain seven "duplicate" videotapes. In addition, as mentioned above, the fact that a period of time elapsed between the time Boyd was asked to cooperate and the commencement of his actual cooperation indicates that he had time to consider his decision. The plain inference to be drawn from the extent and duration of Boyd's cooperation is that his cooperation was voluntary.

### 4. Boyd's awareness of his right to refuse to consent

While the district court concluded that Boyd had not been appraised of his right to refuse to cooperate, FBI Agent Larkin merely testified that "I don't know the answer to that question" when he was asked whether the agents had informed Boyd that he could refuse to cooperate. However, assuming that the district court's conclusion was correct, Larkin also testified that the

13

agents made Boyd aware that his cooperation was strictly voluntary. Based on the other details of Boyd's cooperation, and the fact that he was specifically informed that his cooperation was voluntary, the fact that he may not have been specifically told "you may refuse to cooperate" does not provide much, if any, indicia of involuntariness.

### 5. Boyd's Education and Intelligence and His Belief that the Search would not Reveal Incriminating Evidence.

The record is insufficient for us to render an informed analysis of the last two items. While it is undisputed that Boyd lacked a college degree, no testimony was adduced that Boyd suffered under-average intelligence or was otherwise deficient in his ability to understand the FBI request. In fact, the indication is that Boyd participated in the development of the plan by which the FBI gained access to the tapes. Absent a contrary finding by the trial court, we can infer from the evidence the Boyd is of at least average intelligence and had the ability to render informed consent. On the issue of Boyd's belief that the search would reveal no incriminating evidence, the record is silent. Due to the paucity of evidence on these two elements, we do not consider them in our overall analysis.

### 6. Conclusion

Even without evidence sufficient to reach a conclusion on the last two factors, consideration of the first four factors leads to a conclusion different from the conclusion reached by the district court. Because we find that the district court gave improper weight to certain factors, considered a number of inappropriate

14

factors and did not properly consider a number of relevant factors which lead to a contrary conclusion, we find the district court's holding to be clearly erroneous and the result of the application of an incorrect legal standard. For the reasons set forth above, we hold that Boyd's consent was voluntary.

## C. Effectiveness of Consent

The district court found that Boyd lacked the authority to permit the government to copy the videotapes, and thereby concluded that Boyd's consent, even if voluntary, was not effective. The district court's holding seems to be based on two theories, both of which are based on a flawed application of settled law. First, the court decided that Boyd became an "agent" of the United States by allowing the government access to the videotapes. The court also determined that Boyd lacked sufficient authority to allow the government access to the tapes. We will address these theories in reverse order.

### 1. Authority to Consent

As with all explorations of Fourth Amendment jurisprudence addressing the validity of searches, whether a constitutional interest has been violated depends on whether the questioned governmental conduct infringed upon a reasonable expectation of privacy. See e.g. United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656 (1984). The constitution does not guarantee that a citizen will never be subjected to any search, but rather that a citizen is entitled to be free from unreasonable searches.

15

See Illinois v. Rodriguez, 497 U.S. 177, 183-84, 110 S.Ct. 2793, 2799 (1990),

> What Rodriguez is assured by the trial right of the exclusionary rule, where it applies, is that no evidence seized in violation of the Fourth Amendment will be introduced at his trial unless he consents. What he is assured by the Forth Amendment itself, however, is not that no government search of his house will occur unless he consents; but that no such search will occur that is "unreasonable."

(citation omitted). As discussed previously, one of the exceptions to the presumptive illegality of a warrantless search is consent to the search. At the outset, we note that the Supreme Court has held that the Fourth Amendment does not have to be waived through a "knowing and intelligent" waiver by the person asserting the right.

> There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring "knowing" and "intelligent" waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures.

Schneckloth v. Bustamonte, 412 U.S. at 241, 93 S.Ct. at 2055. Since a "knowing" and "intelligent" waiver is not required by the individual whose right is being waived, there is no prohibition against a third party waiving that right by granting consent to search. See United States v. Matlock, 415 U.S. at 171, 94 S.Ct at 993,

> [W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.

16

Because the government relies on the effectiveness of Boyd's consent, the government must show that Boyd had sufficient authority to permit the agents to copy and view the videotapes. While it is clear that Boyd was not the owner of the videotapes, ownership is not the <u>sine qua non</u> of authority to consent. <u>See e.g.</u>, <u>United States v. Matlock</u>, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7,

> The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having <u>joint access or control for most purposes</u>, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection of his own right and that <u>the others have assumed the risk that one of their number might permit the common area to be searched</u>.

(citations omitted, emphasis supplied). Thus, the district court's task was to determine whether the record supported the government's reliance on Boyd's joint access or control over the videotapes. Our starting point must be the court's holding.

In its memorandum opinion the district court held,

> The Court is of the opinion that no presumption of authority arises simply because Boyd had lawful access to the video-tapes. <u>See</u> <u>Walter v. United States</u>, 447 U.S. 649 (1980). Assuming that such a presumption existed, it is rebutted by the fact that Boyd was instructed by the FBI not to disclose his activities to his employer.

> It is imperative to note that Boyd did not share ownership of the video-tapes with his employer, as one who might share in the ownership of a piece of property. It is undisputed that Boyd needed permission from his employer to do anything with the video-tapes other than that called for in his job. Because no presumption of authority exists or arises, the government cannot rely upon the officials "good faith" belief that consent given by Boyd was effective. <u>See</u> <u>Mengarelli</u>, 426 F.2d at 988.

17

> This is so because the Court distinguishes between mere possession and possession with authority.
>
> In the case at bar, the evidence shows mere possession. Simply because the handyman picks up the mail each day and delivers it to the appropriate location, does not give the handyman the authority to open the mail and share it with others. <u>Walter</u>, 447 U.S. 649. Thus, authority to possess and handle is not authority to view and share. The evidence fails to establish by a preponderance that Boyd had any authority beyond possessory authority.

Our reading of the above language indicates that the district court's conclusion as to Boyd's authority was based on two misguided interpretations of law. First, the district court states that possession with <u>apparent authority</u> is insufficient grounds for the government to show consent. Second, the district court concluded that Boyd lacked <u>actual authority</u> to consent to the government's copying and subsequent viewing of the tapes. Because we find that Boyd had actual authority over the videotapes, we need not engage in a detailed discussion of apparent authority.

### a. Indicia of authority

Certain facts relevant to Boyd's control over the videotapes are uncontroverted. Boyd was the sole White Fabricating employee in Memphis, he was the intended recipient of the packages shipped by White Fabricating, he was authorized to open the packages, he was authorized to extract the videotapes, he had sufficient dominion and control over the packages that he could pick them up and carry them away[7] and the agent's testimony indicates that he

---

[7] The status of the seven "duplicate" videotapes that Boyd allowed the government to keep is not clear from the record. However, there is no indication from the record that White Fabricating ever missed the videotapes when they were not returned.

18

had, at minimum, apparent authority to view the videotapes, at least to the extent necessary to make sure that the machines were functioning correctly. Boyd was the only person in Memphis with the foregoing authority over the videotapes.

To complete the district court's handyman analogy, this handyman's job was not only to pick up the mail and take it to the appointed spot, but also to open the mail and tack it up for public display at a quarter per peek. Appellees argue, and the district court found, that White Fabricating never gave Boyd permission to allow the FBI to copy or view the videotapes. While this fact is clearly true, it is a red herring which has no effect on Boyd's actual or apparent authority.

### b. Assumption of risk

Having vested possession and almost absolute control in Boyd, the law is well settled that Appellees assumed the risk that Boyd would engage in unauthorized conduct with the videos. See e.g. United States v. Matlock, 415 U.S. at 171 n. Frazier v. Cupp, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425 (1969),

> The police, while arresting Rawls, asked if they could have his clothing. They were directed to the duffel bag and both Rawls and his mother consented to its search. During the search, the officers came upon petitioner's clothing and it was seized as well. Since Rawls was a joint user of the bag, he clearly had authority to consent to its search. The officers therefore found evidence against petitioner while in the course of an otherwise lawful search. Under this Court's past decisions, they were clearly permitted to seize it. Petitioner argues that Rawls only had actual permission to use one compartment of the bag and that he had no

---

It is fundamental that if ownership of the seven videotapes was given to Boyd, he was authorized to dispose of them as he saw fit.

19

authority to consent to a search of the other compartments. We will not, however, engage in such metaphysical subtleties in judging the efficacy of Rawls' consent. <u>Petitioner, in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside</u>.

(citations omitted); <u>United States v. Schuster</u>, 684 F.2d 744, 748 (11th Cir. 1982),

> Under the "misplaced trust" theory, the government contends that once Schuster revealed the location of the counterfeit currency to Poteat and provided him with access to the apartment, he took the risk that his confidence might be misplaced and that other agents might become privy to the information revealed. This is precisely what happened. Poteat revealed the information to Agent Bowron, who together with Poteat conducted the <u>authorized</u> search.

M M M M

> The search and seizure which took place was precisely that consented to by the defendant. He must suffer the consequences of misplacing his trust in Poteat. Indeed, "[t]he risk of being...betrayed by an informer or deceived as to the identity of one whom one deals is probably inherent in the conditions of human society." In other words, "that's life."

(citations omitted), <u>reh'g granted and opinion adopted</u>, 717 F.2d 537 (1983)(en banc), <u>cert. denied</u>, 465 U.S. 1010, 104 S.Ct. 1008 (1984).

Indeed, turning back to the Appellee's reasonable expectation of privacy, it was patently unreasonable for Appellees to have any expectation of privacy vis-a-vis Boyd. He had unlimited access to the videotapes, absolute dominion and control over the videotapes and no direct supervision, or indeed any fellow employees in the geographic vicinity. <u>See</u> <u>e.g.</u> <u>Marshall v. Barlow's, Inc.</u>, 436 U.S. 307, 314-15, 98 S.Ct. 1816, 1821 (1978),

20

> Employees are not being prohibited from reporting OSHA violations.  <u>What they observe in their daily functions is undoubtedly beyond the employer's reasonable expectation of privacy</u>.

(emphasis supplied); <u>United States v. Murphy</u>, 506 F.2d 529, 530 (9th Cir. 1974),

> We conclude that Tucker's custody of the key gave him sufficient dominion over the premises to enable him to grant the necessary consent.  Since Murphy himself put the premises under the immediate and complete control of Tucker, who voluntarily consented to the search, we hold that the search was not unreasonable.

<u>cert. denied</u>, 420 U.S. 996, 95 S.Ct. 1433 (1975).

### c.  Authority to view--<u>Walter v. United States</u>

Both the district court and the Appellees also contend that even if the FBI agents were entitled to watch Boyd open the box and extract the videotapes, the subsequent viewing of the videotapes violated their rights.  For this proposition, they rely heavily on the Supreme Court case of <u>Walter v. United States</u>.  <u>Walter</u> involved the interstate shipment of several boxes of obscene film which were mistakenly delivered to a third party rather than the consignee. Employees of the third party opened the packages and discovered individual film boxes, each containing a graphic description and suggestive drawings indicating the films contents.  An employee opened one or two of the containers and attempted, without success, to view the film by holding it up to the light.

The third party notified the FBI, who took possession of the packages, and viewed the films without securing a warrant.  In reversing this Court, a plurality of the Supreme Court found that the warrantless viewing of the films was a "second" search which

21

violated the Fourth Amendment rights of the owner of the films. While a cursory reading of the facts of the Walter opinion may lead one to believe that its holding is dispositive of the case at hand, a more thorough study of the opinion demonstrates its inapplicability.

The most important distinction between Walter and our present case is that in Walter the FBI obtained the films from a third-party who had no actual or apparent authority over the packages. While the third-party was not authorized to open the packages, the fact that they did so was not governmental action, and therefore not violative of the Fourth Amendment. See e.g. Coolidge v. New Hampshire, 403 U.S. 443, 487-90, 91 S.Ct. 2022, 2048-50 (1971). Once the agents came upon the scene, they were not required to avert their eyes or ignore what was before them, but instead the Court held that "[T]here was nothing wrongful about the Government's acquisition of the packages or its examination of their contents to the extent that they had already been examined by third parties." Walter v. United States, 447 U.S. at 656, 100 S.Ct. at 2401.

The Fourth Amendment violation occurred where the government did something it was not authorized to do--conduct a more extensive search without a warrant. See id. 100 S.Ct. at 2402-03, 447 U.S. at 658-59,

> If a properly authorized official search is limited by the particular terms of its authorization, at least the same kind of strict limitation must be applied to any official use of a private party's invasion of another person's privacy. Even though some circumstances--for example, if the results of the private search are in

22

plain view when materials are turned over to the Government--may justify the Government's re-examination of the materials, surely the Government may not exceed the scope of the private search unless it has the right to make an independent search.  In these cases, the private party had not actually viewed the films.  Prior to the Government screening one could only draw inferences about what was on the films.  The projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search. That separate search was not supported by any exigency, or by a warrant even though one could have easily been obtained.

M   M   M   M

The fact that the cartons were unexpectedly opened by a third party before the shipment was delivered to its intended consignee does not alter the consignor's legitimate expectation of privacy.  The private search merely frustrated that expectation in part.  It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection.

In the present case the government obtained the videotapes from Boyd, a third party who not only had lawful possession of the packages, but who had the actual authority to open the boxes, and, at minimum, apparent authority to view the films.  _Walter_ is plainly inapplicable to the case at hand.[8]

### d.  Authority to view--apparent authority

Because _Walter_ does not control this case, we are left to decide whether, once the government had lawful possession of the

---

[8]     Appellee's also mistakenly rely on our decision in United States v. Villarreal, 963 F.2d 770 (5th Cir. 1992).  However, Villarreal is inapplicable to the present situation for the same reason that Walter is inapplicable.  In Villarreal, U.S. Custom's agents obtained possession from a common carrier who had no actual or apparent authority over the 55 gallon drums containing a controlled substance. Unlike the present situation, the government did not gain the consent of a person with actual or apparent authority over the contents of the drums before the search was conducted.

videotapes, a search warrant should have been obtained prior to the agents' viewing. The evidence adduced regarding Boyd's actual authority to view the videotapes does not provide an absolute indication of his authority. At the suppression hearing, the following exchange occurred during the direct examination of Agent Larkin:

> Q     Did part of Mr. Boyd's job of installing the videos put him in a position to be able to view those videos to make sure that the machines were working?
>
> A     I'm sure he could do that. Whether he did that, I have no idea, but certainly he had the ability.
>
> Q     Was his job as the service person to make sure that the videos were playing in the arcade?
>
> A.    I would assume that all servicemen wanted to make sure that before they leave that the videos are functioning properly.

The district court concluded that Boyd did not view the videotapes as part of his job. While this conclusion seems to belie common sense,[9] the record provides insufficient factual foundation to resolve that the district court's conclusion was clearly erroneous.

However, based on the above described indicia of Boyd's control, there is no question that the government could reasonably have relied on Boyd's apparent authority to consent to their review

---

[9]    The parties do not dispute that Boyd was in charge of installing the videotapes and servicing the machines. The purpose of installation of the videotapes was to allow the public to view the movies for a fee. As Agent Larkin testified, sound business practice would dictate that Boyd view at least a small portion of the videotapes to make sure that they were functioning properly. In addition, if a machine malfunctioned, logic dictates that Boyd would be required to view a portion of the videotape to ensure that he had properly repaired the machine. Without clear restrictions to the contrary, authority to view a portion of a videotape is authority to view all of the videotape.

of the videotapes.[10]   Since this reliance was reasonable at the

time, whether they were ultimately correct in their assessment is

not relevant to the analysis.[11]

**e.  Authority to view--no reasonable expectation of privacy**

In addition to concluding that Boyd had apparent authority to

view the videotapes, we also hold that Appellees could not have had

a reasonable expectation of privacy in their contents.[12]   First,

---

[10]   See, e.g., United States v. Shields, 675 F.2d 1152, 1159 (11th
Cir. 1982)(Government need not obtain warrant to listen to audio
recordings where valid consent obtained), cert. denied, 459 U.S.
858, 103 S.Ct. 130 (1982); United States v. Buettner-Janusch, 646
F.2d 759, 767 n. 10 (2nd Cir. 1981),

> Walter is distinguishable from the instant case in two
> respects.  Unlike the defendant in Walter, Buettner-
> Janusch had no independent expectation of privacy in the
> chemicals seized form his laboratory.  These substances
> were either lying open on laboratory benches or were in
> containers that exposed their contents to the casual
> observer. Moreover, the governmental intrusion in Walter
> was not authorized by the consent of a third party who
> satisfied the Gradowski requirements. Here, however, the
> DEA obtained the samples from individuals who had access
> to them and permission to exercise that access.
> Accordingly, Walter does not require us to suppress this
> evidence.

cert. denied, 454 U.S. 830, 102 S.Ct. 126 (1981).

[11]   See Illinois v. Rodriquez, 497 U.S. at 188-89, 110 S.Ct. at
2801.

> As with other factual determinations bearing upon search
> and seizure, determinations of consent to enter must "be
> judged against an objective standard:  would the facts
> available to the officer at the moment...`warrant a man
> of reasonable caution in the belief'" that the consenting
> party had authority over the premises? Terry v. Ohio,
> 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889
> (1968).  If not, then the warrantless entry without
> further inquiry is unlawful unless actual authority
> exists.  But if so, the search is valid.

[12]   See, e.g., United States v. Bonfiglio, 713 F.2d 932, 937 (2nd
Cir. 1983),

>       [W]hen items have been lawfully seized, a separate

given the extent of Boyd's dominion and control over the videotapes, Appellees clearly assumed the risk that Boyd would view them, and therefore had a diminished expectation of privacy in their contents.[13]  As discussed above, when Appellees assumed the

warrant is required to conduct a search thereof if the individual has a high expectation of privacy in the item seized.  Compare United States v. Chadwick, 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977)(separate warrant required to open and search contents of lawfully seized footlocker, in which individual had high expectation of privacy), with Chambers v. Maroney, 399 U.S. 42, 49-51, 90 S.Ct. 1975, 1980-1981, 26 L.Ed.2d 419 (1970)(no separate warrant required to search lawfully seized car, in which individual had diminished expectation of privacy).

[13]    See, e.g., United States v. Jacobsen, 466 U.S. at 117, 104 S.Ct. at 1658,

It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information.  Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit the governmental use of the now nonprivate information: "This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Governmental authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in a third party will not be betrayed."  The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated.

(citations omitted); United States v. Buettner-Janusch, 646 F.2d at 767,

In contrast, Buettner-Janusch retained a legitimate expectation of privacy in the container Jolly removed from the freezer, since this object divulged no clues as to its contents until Weber removed the top.  By applying Gradowski to that object, we note that Macris had Buettner-Janusch's clear permission to open any of the jars of chemicals in the laboratory.  Presumably then, he could have examined the two vials of LSD precursors that Jolly removed from the freezer.  Thus, it was lawful for

risk that Boyd would watch the videotapes, they also necessarily assumed the risk that Boyd would allow someone else to view the videotapes.

Second, it is clear that Appellees could only have had a reasonable expectation of privacy while the videotapes remained sealed and in the possession of the common carrier. Once Boyd gained possession of the packages, that expectation, vis-a-vis Boyd, all but vanished. Since it was intended that Boyd open the boxes, and further intended that Boyd place the videotapes on public display, Appellee's expectation of privacy in the videotapes--once in the hands of Boyd--is clearly minimal. Based on the foregoing, we find that the district court's conclusion that Boyd lacked authority to render effective consent to copy and view the videotapes was clearly erroneous and contrary to settled law.

## 2. Agency Theory

The district court also concluded that, as a result of his cooperation, Boyd became an agent of the government.[14] Under this

DEA chemist Weber, who searched the laboratory and vials at Macris's invitation to do the same.
(footnote omitted).

[14] The "government agent" theory is based on a fundamental concept of Fourth Amendment jurisprudence: no Fourth Amendment violation can occur unless a government actor commits an improper search or seizure. There is no question that "[a] wrongful search or seizure conducted by a private party does not violate the Fourth Amendment, and `such private wrongdoing does not deprive the government of the right to use evidence.'" United States v. Bazan, 807 F.2d 1200, 1202 (5th Cir. 1986), cert. denied, 481 U.S. 103, 107 S.Ct. 1976 (1987), citing, Walter v. United States, 447 U.S. at 656. Courts have found, however, that a private citizen, acting as "an agent or instrument of the government," violates the Fourth Amendment by engaging in an unlawful search. See United States v. Pierce, 893 F.2d 669, 673 (5th Cir. 1990), cert. denied, ___ U.S.

27

theory, Appellees claim Boyd had no more authority to search or seize evidence than any of the FBI agents. Appellees urge us to apply a two-part test, developed by the Ninth Circuit, which we have previously used to determine when a party has become an "instrument or agent of the government." See United States v. Bazan, 807 F.2d at 1203,

> In United States v. Miller, 688 F.2d 652, 657 (9th Cir. 1982), the court held that "two critical factors in the `instrument or agent' analysis are: (1) whether the government knew of or acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." For purposes of reviewing this argument we will assume the adequacy of this formulation.

see also, United States v. Pierce, 893 F.2d at 673.

Appellee's argument suffers from one fatal flaw. Whether Boyd is an agent of the government or not is of no moment unless his conduct violated the Fourth Amendment. In other words, becoming an "agent" for purposes of Fourth Amendment analysis does not terminate one's right to engage in conduct which was authorized prior to entering the agency relationship. Even if we assume Boyd became an agent of the government, he had the exact same actual and apparent authority after agreeing to cooperate with the government as he did prior to entering into the agreement. As discussed above, Boyd's conduct appears from the record to have been within his actual authority, and not violative of the Appellees' reasonable expectation of privacy. Since no Fourth Amendment

---

___, 113 S.Ct. 621 (1992).

28

violation occurred, whether Boyd became a government agent is not relevant.[15]

Notwithstanding the foregoing, we have also determined from the record that even if Boyd did not have <u>actual authority</u> over the videotapes, the government was entitled to rely on Boyd's <u>apparent authority</u>. While the government agents clearly knew of Boyd's actions, they reasonably believed that Boyd had actual authority over the videotapes, and therefore had no reason to believe that any of Boyd's conduct violated the Fourth Amendment. Based on their reasonable belief in the propriety of Boyd's actions, we cannot say that the government agents "knew of or acquiesced in" conduct violative of the Fourth Amendment. Appellees therefore fail to prove the first prong of the Ninth Circuit's <u>Miller</u> test, and consequently have failed to show that Boyd was acting as an agent of the government.[16] For the above reasons, we find that the

---

[15] <u>See</u>, <u>e.g.</u>, <u>Coolidge v. New Hampshire</u>, 403 U.S. at 487-89 (1971)(No Fourth Amendment violation where wife voluntarily turned over husband's clothes and gun to police officers); <u>United States v. Rizk</u>, 842 F.2d 111, 112 (5th Cir. 1988)(No Fourth Amendment violation where government informant had joint access to a briefcase and consented to government search), <u>cert. denied</u>, 488 U.S. 832, 109 S.Ct. 90 (1988); <u>Pleasant v. Lovell</u>, 974 F.2d at 1230 ("[D]efendants could inspect and copy items in Adams' custody that defendants reasonably believed Adams had authority to possess; Adams could share items properly in her custody with defendants without violating plaintiffs' constitutional rights."); <u>United States v. Schuster</u>, 684 F.2d at 748-49(No Fourth Amendment violation where third-party, who had become agent of the government, allowed Secret Service Agent to accompany him on visit to defendant's apartment where defendant had consented to third-party's entry).

[16] <u>See</u>, <u>e.g.</u>, <u>United States v. Pierce</u>, 893 F.2d at 674 ("There was no evidence that the airline employees opened the package at

29

district court's conclusion that Boyd was an agent of the federal government was clearly erroneous.

## IV.  STANDING

Because we find that the district court erroneously granted the Appellee's motion to suppress, we decline to consider whether the government's lack of standing assertion was timely.

## V.  CONCLUSION

Because we find that the district court's opinion was based on a misapprehension of the applicable law and clearly erroneous determinations of fact, we hold that the court's decision to grant the motions to suppress must be reversed.  The judgment of the district court is reversed, Appellees' Motion to Suppress is denied, and the case is remanded for further proceedings consistent with this opinion.

REVERSED, RENDERED, and REMANDED.

the direction, or even suggestion, of the DEA.  We conclude that the airline employees opened that package to further the airline's own ends, not solely to assist law enforcement officers."); United States v. Bazan, 807 F.2d at 1203-04; United States v. Ford, 765 F.2d 1088, 1090 (11th Cir. 1985)(Government had no prior knowledge of search and did not encourage search); United States v. Miller, 688 F.2d 652, 657 (9th Cir. 1982)("Because Szombathy had not proposed to do anything illegal, we see no reason why the officers should have restrained him from visiting Miller's property."); Cf. United States v. Reed, 15 F.3d 928, 931 (9th Cir. 1994)("Officers Rose and Sponholz definitely `knew of and acquiesced' in Watson's search.  They were personally present during the search, knew exactly what Watson was doing as he was doing it, and made no attempt to discourage him from examining Reed's personal belongings beyond what was required to protect hotel property.  Watson reported his findings to them as he searched.").