**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
January 31, 2012

No. 10-41099

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

IGNACIO ZAVALA

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
(09-CR-350)

Before JONES, Chief Judge and DAVIS and DeMOSS, Circuit Judges..
W. EUGENE DAVIS, Circuit Judge.[*]

Ignacio Zavala was indicted in a two count indictment with (1) conspiracy to possess more than 500 grams of cocaine with intent to distribute and (2) possession of more than 500 grams of cocaine with intent to distribute. Zavala filed a motion to suppress evidence which the district court denied after conducting an evidentiary hearing. With the consent of the government and the approval of the district court, Zavala then entered a conditional plea of guilty to Count 2 of the indictment reserving his right to appeal the adverse ruling on his

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-41099

motion to suppress.  We conclude that the district court erred in denying the motion to suppress and vacate the conviction.

## I.

At 9:00 PM on February 21, 2009, Trooper Sam Montalvo of the Texas Department of Public Safety ("Montalvo") observed Defendant Ignacio Zavala ("Defendant" or "Zavala") driving on Highway 281 in Southern Texas.  He saw that the vehicle Zavala was driving had an obscured license plate, a violation of the Texas Transportation Code.  Prior to stopping the vehicle, Montalvo ascertained the license plate came from Illinois, and his original check indicated its registration was expired.  Montalvo later determined that the vehicle's registration was valid and that the confusion resulted from a misreading of the Illinois registration.[1]  Montalvo testified that after he stopped the vehicle he conducted a visible safety inspection of the vehicle and found no obvious evidence of unsafe equipment or drugs.  He also said that once he engaged Zavala he noticed that Zavala – who was traveling alone – had "shifty" movements and appeared tense and sweaty.

Montalvo told Zavala the reason for the stop, and Zavala agreed after looking at the license plate that it was obscured by a plastic frame.  Zavala volunteered that he had used a friend's vehicle to bring family members from Illinois to McAllen for a wedding.  Zavala could not produce his driver's license, though he did furnish Montalvo an Illinois state identification card.  He stated that he had stayed at a Motel 6 the night before but had overslept, missing the 12:00 checkout time, and he speculated he may have left his license at the hotel.  Montalvo found it unusual that Zavala would provide information about his trip without prompting.  Montalvo asked for a copy of the motel receipt, which did

---

[1] Clearing up this (honest) confusion ultimately significantly prolonged the stop.

not reflect an additional charge for an overstay. Zavala claimed he had paid the extra charge in cash.

Montalvo told Zavala to sit in the passenger seat of the police cruiser while Montalvo conducted his investigation. He was not restrained and the doors were not locked. At Montalvo's prompting, Zavala retrieved his cell phone from his car to call the hotel about his missing driver's license. Using Zavala's state identification card, Montalvo was able to check on Zavala's driver's license, which showed that Zavala had prior convictions and that his license was expired. Zavala asked if he could remove the frame from the license plate, and Montalvo gave him permission to do so. Each time Zavala left Montalvo's cruiser he obtained Montalvo's permission.[2]

When Defendant returned to the cruiser, Montalvo asked Zavala about his prior arrests. Then, in Zavala's presence, Montalvo told the radio dispatcher that "we're probably going to go to the checkpoint and I want to run a dog on him."

Thereafter, the following exchange occurred:

Montalvo: "I'm going to go ahead and take you to the checkpoint sir. That way you won't waste any more time here..."
Defendant: "Ok"
Montalvo: "and if the dog hits I'm going to have to search your vehicle. Ok?"
Defendant: "Alright. Yeah, that is not going to be a problem."
*(some parts of conversation omitted)*
Defendant: "How far is the checkpoint from here?"
Montalvo: "Well you're going that way right?"
Defendant: "Yeah."
Montalvo: "Ok. Twenty, twenty-five (miles)."
*– Montalvo hands Zavala a citation for driving with a suspended license –*
Montalvo: "If you do not mind, I'm gonna...I'm going to escort you over to the uh checkpoint?"

---

[2] The stop at this point had lasted about half an hour.

No. 10-41099

Defendant: "Uh Huh."
Montalvo: "And uh..run the dog on you and then uh.. if it doesn't hit
or anything, then we're good to go."
Defendant: "Alright."
Montalvo: "You want to follow me over there sir?"
Defendant: "Sure."

R. 78-79. As stated, during the exchange and after he obtained Zavala's consent to follow him to the checkpoint, Montalvo wrote Zavala a citation for driving with a suspended license which he handed to Zavala.  Defendant returned to his vehicle and followed Montalvo the additional 20-25 miles to the checkpoint.  At the checkpoint, a canine sniff of the vehicle resulted in an alert, and a search in secondary revealed bundles of cocaine.

At the suppression hearing, Montalvo stated on cross-examination that he did not tell Zavala that he was free to go because he suspected that something illegal was in the vehicle.  Zavala never attempted to turn around and head south on Hwy. 281.  However, Montalvo stated that if Zavala had attempted to do so, he would have stopped him.  He said that under those circumstances he would have detained Zavala and had him searched regardless of his consent.

The district court made oral findings on the record.  It found that the initial stop was valid based on the obscured license plate and on Montalvo's mistaken belief that the vehicle registration was expired.  The court concluded that the approximately 34-minute stop was reasonable under the circumstances, given Zavala's lack of a license and the need for so many computer checks because of Montalvo's unfamiliarity with Illinois procedures.  The court noted that throughout the encounter Zavala had been cooperative and that he never stated that he wanted to leave, though Montalvo never informed him that he was free to go.  The court also found that Zavala had knowingly consented to the checkpoint search of the vehicle.  The district court acknowledged Montalvo's subjective belief that Zavala was not free to leave but noted that Montalvo had

No. 10-41099

not expressed this belief to Zavala. As a result of this analysis, the court denied the motion to suppress.

Zavala entered a conditional guilty plea to the substantive drug count of possession with intent to distribute more than 500 g of cocaine, reserving his right to challenge the district court's denial of his suppression motion. The district court sentenced Zavala to 63 months in prison, to be followed by a four-year term of supervised release. Zavala filed a timely notice of appeal.

This Court has jurisdiction over a denial of a motion to suppress following an entry of a conditional guilty plea under Fed. R. Crim. Pro. 11(a)(2).

## II.

On appeal, Zavala does not contest the court's rulings on the validity of the initial stop or the length of his detention. He asserts only that the district court erred in concluding that he voluntarily consented to the officer's request that he follow him to the checkpoint.

The court reviews the evidence relied on by the district court in support of its denial of a motion to suppress in the light most favorable to the prevailing party, here the Government. *United States v. Garcia*, 604 F.3d 186, 189-90 (5th Cir.), *cert. denied*, 131 S. Ct. 291 (2010). In reviewing a district court's denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Lopez–Moreno*, 420 F.3d 420, 429 (5th Cir. 2005). The Government "has the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given." *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993) (citing *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir.1990) (en banc)).

## III.

Warrantless searches are unconstitutional unless they meet one of a limited number of exceptions. *United States v. Jenkins*, 46 F.3d 447, 451 (5th

No. 10-41099

Cir. 1995). One exception is a search conducted pursuant to voluntary consent. *Id.*

We examine six factors to determine the voluntariness of consent. *Jenkins*, 46 F.3d at 451. The six factors include (1) the voluntariness of the defendant's custodial status, (2) whether the police engaged in coercive conduct, (3) the extent and degree of the defendant's cooperation with the police, (4) the defendant's knowledge of his right to refuse consent, (5) the defendant's level of intelligence and education, and (6) the belief of the defendant that a search will not reveal incriminating evidence. *Id.* "[N]o single factor is dispositive or controlling of the voluntariness issue." *U.S. v. Olivier–Becerril*, 861 F.2d 424, 426 (5th Cir. 1988). Instead, "[c]onsent will be found voluntary if after considering all the circumstances then obtaining, it may be established that it was 'the product of an essentially free and unconstrained choice by its maker.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973); *see also Galberth*, 846 F.2d at 986 (considering the six factor test "[i]n view of the totality of the circumstances."). In most cases, as here, some of these factors will not be seriously implicated, and only one or a subset of the factors will truly be at issue and drive the ultimate conclusion. *See, e.g., United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993); *United States v. Tedford*, 875 F.2d 446, 451–52 (5th Cir. 1989); *United States v. Olivier–Becerril*, 861 F.2d 424, 426 (5th Cir. 1988).

*Factors: Voluntariness of Custody and Coercive Police Conduct.*

1.    *Voluntariness of Custody; and*

2.    *Coercive Police Conduct*

Zavala maintains that these two factors drive the result in this case and weighs against a finding of voluntary consent. Zavala does not challenge the officer's authority to stop him based on his obscured license plate. He points to several critical uncontested facts, however, related to Trooper Montalvo's conduct that were coercive. First, Montalvo made it clear to the dispatcher – in

No. 10-41099

Zavala's presence – that he planned to take Zavala to the check point "to run the dog on him."    Second, Trooper Montalvo obtained Zavala's verbal consent to follow him to the checkpoint while he was in the police cruiser.  Although the doors were not locked, we find it significant that he was in the cruiser at the trooper's direction and each time he exited the cruiser, he obtained Montalvo's permission.[3]  Third, Trooper Montalvo never advised Zavala he was free to go or decline his invitation to follow him to the checkpoint.  The trooper's exchange with Zavala, which the Government relies on to show his consent to follow to the checkpoint, can more accurately be described as directions to follow rather than request for consent to follow.  The trooper began the conversation by stating: "I'm going to go ahead and take you to the checkpoint, sir." It was only after this conversation that Trooper Montalvo returned his identification card and gave him his traffic violation.[4] Zavala contends that all of this conduct by the trooper was "inherently coercive."

We agree and we are persuaded that all of these facts, in combination, weigh strongly against the government.  After Montalvo told the dispatcher in Zavala's presence what he intended to do (take Zavala to the checkpoint to run the dog on him), together with all other uncontested facts recited above, a reasonable person would not feel that he was free to refuse the trooper's "request" to follow him.

*2. Cooperation*

Zavala asserts that the cooperation factor weighs against the voluntariness of his consent as well.  He asserts that in the absence of evidence that "he actively cooperated with the search" of his vehicle, there was no

---

[3] This can be considered as a coercive factor.  *See U.S. v. Jones*, 234 F.3d 234, 242 (5th Cir. 2010).

[4] *See U.S. v. Jenson*, 462 F.3d 399, 406-07 (5th Cir. 2006)(drawing adverse inference against the government on this factor from fact that papers not returned before consent given.)

evidence of his cooperation. Although Zavala acknowledges that he was cooperative in answering questions during the traffic stop, he claims he was no more cooperative than anyone would be during a traffic stop.

This factor is neutral. Zavala's cooperation with the traffic stop does not support or contradict a finding of cooperation that is relevant to our inquiry.

### 3. *Ability to Refuse Consent*

The district court found that although Montalvo testified that Zavala would not have been free to refuse to follow him to the checkpoint there was no evidence that Montalvo advised Zavala of this fact. Thus, based on the trooper's testimony, the district court found that Zavala "was not under the impression that he . . . did not have the right to refuse consent."

This finding is problematic given statements to the dispatcher that he planned to bring Zavala to the checkpoint to run the dog on him. In light of this statement and the facts recited above, it is difficult to see how Zavala could have believed he was able to refuse Montalvo's request.

In our cases with ambiguous statements of consent or where consent was obtained while the officer was still in possession of a defendant's personal effects, we have found it important that the officer expressly inform the suspect of his right to refuse consent, and as stated above, Trooper Montalvo made no such statement. *See Shabazz*, 993 F.2d at 438 (Defendant given written consent form, which stated he had the right to refuse to consent to the search).

### 4. *Education and Intelligence*

The district court made no findings on Zavala's intelligence or education, and they do not seem relevant here. The recording leads us to conclude that Zavala had at least average intelligence and education.

### 5. *Belief of Discovery*

The court also did not address Zavala's knowledge or belief that incriminating evidence would be found. Zavala asserts that "it appears likely

No. 10-41099

that Mr. Zavala thought that incriminating evidence would be found" because Montalvo told him that they would run a dog "on him". We saw nothing in the record that would support either Zavala or the Government on this issue, which is of slight importance in any event.

The important factors discussed above weigh strongly against a finding of consent, and none weigh in favor. More importantly, when viewed from an objectively reasonable perspective and considering the circumstances of the stop and the exchanges between the trooper and Zavala as a whole, we find that the consent cannot be said to have been "the product of an essentially free and unconstrained choice" by the defendant. *Schneckloth*, 412 U.S. at 225.

## CONCLUSION

For the above reasons, we conclude that the district court erred in denying the motion to suppress. Accordingly the judgment of the court is REVERSED and the conviction is VACATED.

EDITH H. JONES, Chief Judge, dissenting:

With due respect, my colleagues have not satisfactorily explained why the findings of the district court concerning the voluntariness of Zavala's consent to search were clearly erroneous. On the contrary, it seems to me that the entirety of the incident demonstrates courtesy and cooperation between the trooper and Zavala, rather than imperiousness or implied coercion. In particular, it is not coercive for the trooper to have allowed Zavala to sit in the patrol car during the extended license check—better to sit than stand at the roadside. Nor is it coercive that Zavala asked permission to step out of the car. This was a reasonable and cautious approach, matched by the trooper's agreement with each request. Nor did it enhance the coercion that the trooper mentioned a drug sniff in Zavala's presence. Appellant had to know they weren't going to the checkpoint for a coffee klatsch. Finally, had the trooper been truly concerned about the sincerity of Zavala's consent, I assume he would never have permitted him to drive his own car over twenty miles to the checkpoint. For these reasons, the district court was well within its discretion to make the findings that underlie his legal conclusion that the consent to search was voluntary. I respectfully dissent.