**Michael R. O'CONNOR, Appellant,**

v.

**MUNICIPALITY OF ANCHORAGE,
Appellee.**

No. A–5002.

Court of Appeals of Alaska.

Dec. 15, 1995.

Hearing Denied Feb. 20, 1996.

Christine S. Schleuss, Anchorage, for Appellant.

James L. Walker, Assistant Municipal Prosecutor, and Mary K. Hughes, Municipal Attorney, Anchorage, for Appellee.

Before BRYNER, C.J., and MANNHEIMER, J., and ANDREWS, Superior Court Judge.*

*OPINION*

MANNHEIMER, Judge.

We renew our consideration of Michael R. O'Connor's appeal of his conviction for driving while intoxicated, Anchorage Municipal Code § 9.28.020. Having considered O'Connor's claims, we affirm his conviction.

To recapitulate the facts of the case: O'Connor was detained by two private citizens, Mssrs. Hugo and Campbell, at a 7–Eleven convenience store. Hugo observed O'Connor pull into the parking lot and concluded that O'Connor was intoxicated. Hugo maneuvered his own car to prevent O'Connor from driving away. He then asked Campbell, the store clerk, to call the police. Campbell observed O'Connor and also concluded that O'Connor was intoxicated. When O'Connor tried to secure a ride from a cab driver, Campbell dissuaded the cab driver from accepting O'Connor as a passenger. The police eventually arrived at the 7–Eleven and arrested O'Connor. *O'Connor v. An-*

*chorage,* Memorandum Opinion and Judgement No. 2942 (Alaska App., July 13, 1994), pp. 1–2.

■ O'Connor asserts that the evidence against him should be suppressed because he was subjected to an unlawful arrest by the two private citizens. However, as we noted in our prior opinion, the exclusionary rule does not apply to actions of private citizens unless the private citizens acted in conjunction with, or at the behest of, the government. *O'Connor,* Memorandum Opinion at 2–3. We therefore remanded this case to the district court for consideration of O'Connor's argument that Hugo and Campbell had acted in conjunction with the police, so that their detention of O'Connor should be considered government action for purposes of the Fourth Amendment and the exclusionary rule.

Following an evidentiary hearing, District Court Judge Gregory J. Motyka concluded that the Anchorage police "[n]either instigated [n]or significantly participated in the actions of ... Hugo and Campbell." Judge Motyka found that Hugo took action to detain O'Connor (blocking the exit of O'Connor's car) before anyone called the Anchorage police. Judge Motyka further found that Hugo's action was motivated by his own "personal interest in making sure [O'Connor] did not get into his car and drive away, since [Hugo] and his family were on the road at the same time".

O'Connor argues that, even if Hugo and Campbell began their detention of O'Connor without police instigation, their actions later became government action for purposes of the Fourth Amendment. O'Connor notes that, after Hugo and Campbell notified the police of what was occurring at the 7–Eleven store, the police did nothing to dissuade Hugo and Campbell from continuing their detention of O'Connor.

According to testimony presented at the hearing on remand, when the police receive a telephone call like the one in this case (a private citizen informing the police that he or

---

* Sitting by assignment of the chief justice made pursuant to Article IV, Section 16 of the Alaska

Constitution. ·

she is holding a suspected drunk driver), the police dispatcher will neither encourage the private citizen to continue the detention nor suggest that the private citizen release the driver. Rather, the dispatcher will merely say that the police are on their way.

O'Connor argues that this practice constitutes tacit condonation of the private citizen's arrest. He contends that the police, by failing to question the basis for O'Connor's detention, tacitly encouraged Hugo and Campbell to hold O'Connor until patrol officers could arrive to investigate. Therefore, O'Connor argues, any evidence obtained through Hugo and Campbell's actions should be suppressed if it later turns out that Hugo and Campbell lacked probable cause to make an arrest.

O'Connor cites *United States v. Reed*, 15 F.3d 928, 930–33 (9th Cir.1994), for the proposition that a private citizen's violation of Fourth Amendment rights becomes attributable to the government when the police know of the private citizen's intended search or seizure and acquiesce in it, intending to take advantage of the fruits of the private citizen's actions. This, however, is too broad an interpretation of *Reed*.

In *Reed*, the police waited outside a hotel room while the hotel manager checked the room, ostensibly to make sure that hotel property had not been damaged. However, the hotel manager's search of the room far exceeded what was necessary to determine that the room was in good order. As the police stood in the doorway, the hotel manager rummaged through drawers and a closed briefcase, concededly searching for evidence that the hotel guest was engaged in drug dealing. 15 F.3d at 931. The Ninth Circuit found that the hotel manager, "[by] opening Reed's briefcase and dresser drawer[s]", exceeded the limits of whatever legitimate private motive he might have had to search the room. 15 F.3d at 932. The Ninth Circuit further found that the police officers who stationed themselves at the door to the room "knew [that the hotel manager] was invading Reed's personal property, knew that this conduct [was] prohibited by law, and helped [the manager] do so anyway". *Id.* That is, the

police knew that the hotel manager was exceeding his authority, and they abetted him.

By contrast, in *United States v. Cleaveland*, 38 F.3d 1092 (9th Cir.1994), the Ninth Circuit distinguished *Reed* and refused to suppress evidence obtained during a private search. In *Cleaveland*, an electric utility had received information that one of its customers was illegally diverting electricity to conduct indoor marijuana cultivation. The electric company notified the police that it would be sending an agent to inspect the electric meter at Cleaveland's residence. The police sent a detective to accompany the electric company employee. When the employee examined the wiring going into Cleaveland's house, he discovered that Cleaveland had surreptitiously tapped the company's electric lines. 38 F.3d at 1093.

The Ninth Circuit concluded that this had been a private search:

> It was [the electric company], not the police, who initiated the plan to inspect the meter. There was no reason why the detective should have restrained [the electric company employee] or discouraged him in his search, [*United States v.*] *Miller*, 688 F.2d [652,] 657 [ (9th Cir.1982) ], because [the employee] never exceeded his authority under the Customer Service Agreement to go on the property and inspect the meter. *Compare Reed*, 15 F.3d at 931–32 (after confirming hotel room's [good] condition, manager proceeded to rummage unlawfully through defendant's dresser drawers and luggage while police watched).

*Cleaveland*, 38 F.3d at 1094 (internal quotations omitted). *See also United States v. Jenkins*, 46 F.3d 447 (5th Cir.1995):

> While the government agents clearly knew of Boyd's [the private citizen's] actions, they reasonably believed that Boyd had actual authority over the [property], and therefore [they] had no reason to believe that any of Boyd's conduct violated the Fourth Amendment. Based on their reasonable belief in the propriety of Boyd's actions, we cannot say that the government agents "knew of or acquiesced in"

conduct violative of the Fourth Amendment.

*Jenkins,* 46 F.3d at 460.

■ This point (whether the police have a duty to intervene in, or prevent, an ongoing private search) is addressed in Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (2nd ed. 1987), § 1.8(b). After quoting *Stapleton v. Superior Court,* 70 Cal.2d 97, 73 Cal.Rptr. 575, 578–79, 447 P.2d 967, 970–71 (1968) ("[Police] knowledge of the [private citizen's] illegal search coupled with a failure to protect the petitioner's rights against such a search suffices [to establish government involvement in the search]"), *LaFave* continues:

> [W]hen are the police obligated to [instruct a private person not to engage in a search] or otherwise take steps to prevent a private search? Although the issue is not well developed in the decided cases, some pertinent observations may be made. For one thing, the reference in *Stapleton* is to an "illegal search," and thus it may be said that the police need not attempt to prevent a search which the private party may lawfully make merely because such a search could not be undertaken by the police officer himself. Secondly, it would appear to be of some significance that in *Stapleton* the police put the agent into the situation where he was in a position to make the search. If, on the other hand, police have been called to the scene and are thus present while a private person retrieves evidence of a crime which he had uncovered before contacting the police, and the private person's authority to make the search is not obviously nonexistent, courts do not appear to be concerned about the failure of the police to prevent the search.

*LaFave,* § 1.8(b), Vol. 1, pp. 181–82.

■ Applying this discussion of private searches to the facts of O'Connor's case (a private arrest), we conclude that Hugo and Campbell's arrest of O'Connor was not government action for Fourth Amendment purposes. The police did not instigate Hugo and Campbell's detention of O'Connor, nor did they suggest to Campbell that he dissuade the cab driver from accepting O'Connor as a passenger. The testimony at the remand hearing indicated that, even after the police were notified that Hugo and Campbell had detained O'Connor on suspicion of drunk driving, the police dispatcher gave no instructions to Hugo and Campbell but only notified them that officers were on their way.

■ Private citizens are authorized to arrest suspected lawbreakers if the crime is committed in their presence. AS 12.25.030(a)(1). Campbell told the police that he and Hugo were holding an intoxicated driver at the 7–Eleven store. Based on this information, the police could reasonably conclude that a criminal offense had been committed in Hugo and Campbell's presence and that the two men had the authority to detain O'Connor. The police therefore had no obligation to direct Hugo and Campbell to release O'Connor.

O'Connor also argues that even if the police did not instigate Hugo's and Campbell's actions, their detention of O'Connor is nevertheless attributable to the government because their only motive in detaining O'Connor was to aid the police in law enforcement. O'Connor concedes that Hugo and Campbell might have had a private interest in making sure that O'Connor did not drive in an intoxicated state. Nevertheless, O'Connor asserts, Hugo and Campbell had no private interest in stopping him from leaving in a cab. O'Connor argues that Hugo and Campbell had only one possible motive—aiding law enforcement—when they dissuaded the cab driver from accepting O'Connor as a passenger. This, too, in O'Connor's view, transformed Hugo's and Campbell's actions into government action.

■ We reject O'Connor's argument. First, if a search is indeed a private search (that is, if the government has not instigated or cooperated in the search), then it makes no difference whether the citizen's motive

was to uncover crime or aid law enforcement. *LaFave*, § 1.8(a), Vol. 1, p. 177 & n. 23. Second, we disagree with O'Connor's assertion that citizens have no personal interest in making sure that an apprehended drunk driver is turned over to the authorities.

The judgement of the district court is AFFIRMED.

COATS, J., not participating.