**UNITED STATES of America**

v.

**Melchor COTA–LOPEZ (1) Juan Carlos Urias–Millan (2) Jose Clemente Cota–Lopez (3)**

**No. CRIM.EP–02–CR–1072–P.**

United States District Court,
W.D. Texas,
El Paso Division.

Nov. 13, 2002.

Mark S. Kloster, U.S. Attorney's Office, El Paso, TX, for Plaintiff.

Joseph Sib Abraham, Jr., Robert Ramos, Ray Velarde, Attorney at Law, El Paso, TX, for Defendants.

### AMENDED MEMORANDUM OPINION AND ORDER [1]

MARTINEZ, District Judge.

On this day, the Court considered four motions filed in the above-captioned cause:

---

1. The Court issues this Amended Memorandum Opinion and Order, which incorporates corrections, primarily of a clerical nature, to the original Memorandum Opinion and Order entered November 12, 2002. This Amended

582

(1) Defendant Melchor Cota–Lopez's Motion to Suppress Evidence and Memorandum of Law in Support of Motion to Suppress Evidence ("Motion to Suppress I") filed June 27, 2002, (2) Defendant Melchor Cota–Lopez's Supplemental Motion to Suppress Evidence ("Motion to Suppress II") filed on September 12, 2002, (3) Defendant Juan Carlos Urias–Millan's Motion to Suppress Evidence and Memorandum of Law ("Motion to Suppress III") filed on July 10, 2002, and (4) Defendant Jose Clemente Cota–Lopez's Motion to Suppress Evidence and Memorandum of Law ("Motion to Suppress IV") filed July 8, 2002. Following a hearing on said motions on August 22, 2002, counsel was provided with an opportunity to submit supplementary briefs and arguments in support of their respective motions and responses. The Court received the supplementary briefs on October 4, 2002,[2] and thereafter took the motions under advisement.

After careful consideration of the evidence, arguments, and all pleadings, the Court is of the opinion that Defendant Melchor Cota–Lopez's Motion to Suppress I and Motion to Suppress II should be denied, Defendant Juan Carlos Urias–Millan's Motion to Suppress III should be denied in part and granted in part, and Defendant Jose Clemente Cota–Lopez's Motion to Suppress IV should be denied in part and granted in part.

## I. FACTS

1. On May 13, 2002, Detective Louis Serrano ("Detective Serrano") of the Narcotics Division of the El Paso Police Department ("EPPD") was performing routine surveillance[3] at a self-packing type business when he observed a blue 1995 Chevrolet Astro van (bearing Texas license plates) arrive with four occupants, later identified as Defendant Melchor Cota–Lopez ("Defendant Melchor"), Defendant Jose Clemente Cota–Lopez ("Defendant Jose"), Defendant Juan Carlos Urias–Millan ("Defendant Urias"), and Guillermo Cota–Lopez ("Guillermo"). (Tr. 82–84) Defendant Jose, Defendant Urias and Guillermo went into the busi-

Memorandum Opinion and Order differs from the earlier memorandum opinion only in that it properly addresses Defendant Melchor's argument regarding the suppression of any incriminating statements made by him (see infra footnote 8).

2. The Court granted the Government's unopposed "Motion for Extension of Time to File Findings of Fact and Conclusions of Law," thereby giving the Government until October 4, 2002 to submit its proposed Findings of Fact and Conclusions of Law.

3. Detective Serrano frequently performs surveillance at self-packing type businesses and has been successful in identifying drug traffickers (who frequent these types of businesses) through this type of surveillance. (Tr. 83) By looking for suspicious activity at such businesses, the police often uncover the location of "stash houses":

A stash house is a place or location utilized by drug traffickers to maintain their drugs, monies derived from the sale of controlled substances, drug paraphernalia such as grinders, cutting agents, and packaging material. Typically, stash houses are rented in the names of individuals trusted by the drug trafficker such as family members or paramours. This is done in an attempt to divert the attention of law enforcement. Furthermore, stash houses are often located within proximity to the area where the drug trafficker either lives or engages in drug dealing. This proximity provides the drug trafficker with access to his or her product and his or her profits. The location of a stash house also provides the drug trafficker with a measured sense of security in that it removes or insulates the trafficker from the scrutiny of local police and other drug traffickers. It is not uncommon for a stash house to be located in a residential neighborhood.

U.S. v. Whitner, 219 F.3d 289, 292 (3rd Cir. 2000).

ness and came out a short time later with several unassembled cardboard boxes. (Tr. 82–83)

2. After taking notice of the van and its occupants,[4] Detective Serrano followed the van to a residence located at 5912 Gene Torres Drive in El Paso, Texas (the "Residence"). Along the way, the van stopped briefly at a travel agency and hardware store before arriving at the Residence at about 3:40 p.m. (Tr. 62, 124, 127) Detective Serrano continued his surveillance of the Residence, observing the movement of the van and its occupants to and from the Residence.

3. A task force of local and federal law enforcement agencies assisted Detective Serrano in this investigation. Participants in the task force included (in addition to Detective Serrano) Detective Frank Gutierrez ("Detective Gutierrez"), Sergeant Silex ("Sgt.Silex"), and Officer Jose Vega ("Officer Vega") from the Narcotics Division of the EPPD, along with Larry Hightower ("Agent Hightower"), Special Agent with the Federal Bureau of Investigation (collectively, the "officers"). (Tr. 12–13, 165)

4. During the surveillance (at approximately 3:50 p.m.), Defendant Jose and Defendant Urias left the Residence in the van. (Tr. 62) The van took an indirect route to a local meat market, which Detective Serrano perceived as a "heat run," a counter-surveillance maneuver done to determine whether the police are conducting surveillance. (Tr. 84–85, 103) Defendant Jose and Defendant Urias went into the meat market. None of the officers followed them inside the meat market. (Tr. 132)

5. After approximately ten minutes, Detective Gutierrez observed Defendant Jose and Defendant Urias leave the meat market and drive the van to a nearby convenience store. Although Defendant Jose and Defendant Urias both had cellular phones on them, Defendant Urias, the driver, exited the van and made a phone call from the public payphone at the convenience store. Meanwhile, Defendant Jose drove the van back to the Residence and arrived there at approximately 4:10 p.m. (Tr. 12, 86, 133) After completing the call, Defendant Urias walked back to the Residence. Defendant Urias arrived at the Residence about five minutes after Defendant Jose. (Tr. 65, 87)

6. A short time later (at about 5:10 p.m.), Defendant Jose and Defendant Urias again left the Residence in the van and were subsequently stopped by Officer Vega for an improper lane change violation at an intersection near the Residence. (Tr. 137, 153) After the vehicle was pulled over, Defendant Urias and Defendant Jose provided Officer Vega their identification, which indicated that they were citizens of the Republic of Mexico and aliens to the United States. (Tr. 144)

7. Officer Vega, who immediately questioned Defendant Jose and Defen-

---

4. In choosing a particular vehicle to surveil, Detective Serrano looks for specific characteristics such as the number of occupants in the vehicle, the physical characteristics of an individual, the type of clothes an individual is wearing, any actions that he thinks are suspi-

cious by an individual while at the business or upon leaving the business (*i.e.* whether any "counter-surveillance" maneuvers were used upon departure from the store), and the location of where the vehicle is registered. (Tr. 83)

dant Urias after they were detained, did not give a *Miranda* warning to them. (Tr. 155) Specifically, Officer Vega asked Defendant Jose and Defendant Urias about their travel plans. Defendant Urias told Officer Vega that they were coming from Cielo Vista Mall, (which is in fact located in the general direction to where the van was then traveling). Defendant Jose contradicted Defendant Urias and answered that they were coming from Burlington Coat Factory (which is also located in the direction to where the van was then traveling, but not in the same location as Cielo Vista Mall). (Tr. 144–145) Officer Vega then asked Defendant Jose and Defendant Urias whether they had come from the Residence, and both denied having been at the Residence or having any knowledge about it. (Tr. 155) Officer Vega immediately relayed this information to Detective Serrano, who informed Officer Vega that he was going to perform a "knock and talk"[5] at the Residence. (Tr. 145)

8. Shortly thereafter, other EPPD officers arrived at the scene to assist Officer Vega with the stop. Officer Vega then proceeded to the Residence with his narcotic-detecting canine to assist with the "knock and talk." (Tr. 153) Defendant Jose and Defendant Urias remained in police custody at the traffic stop until the officers could conduct a consensual search of the Residence (a period of approximately forty minutes). (Tr. 145) Defendant Jose and Defendant Urias were not handcuffed, no threats or violence were used against them, and there was no overt display of authority (*i.e.* no weapons were drawn by any of the officers at the stop scene). (Tr. 149)

9. In the meantime, Detective Serrano, Detective Gutierrez, and Sgt. Silex initiated a "knock and talk" at the Residence. (Tr. 13) There was no direct sidewalk or path from the street to the front door, which therefore required the officers to walk up the driveway to the garage area in order to approach the house. (Tr. 88) The Residence had no fences, gates, "keep out" signs, or any other similar barriers. (Tr. 104)

10. During this time, Officer Vega was stationed at the sidewalk in front of the house with his canine in the event that permission to search was granted. (Tr. 141, 157) While on the sidewalk, the canine immediately detected an odor. (Tr. 148) The canine began pulling Officer Vega in the direction of the front door of the Residence. The canine sniffed at the bottom of the seam of the front door and gave an "indication" that she was detecting the existence of narcotics at the Residence. The canine finally "alerted" by barking and scratching at the door. (Tr. 149, 158–159).

11. The officers performing the "knock and talk" were dressed in civilian clothes (jeans and t-shirt), and all were armed with concealed weapons. (Tr. 15)

12. Upon approaching the Residence, the garage door to the Residence was open, but the officers could see the silhouette of a person standing behind the screen door inside the garage area. (Tr. 13–14) The offi-

---

5. The "knock and talk" procedure consists of knocking on a suspect's door to engage in conversation regarding suspected narcotic ac-tivity occurring at the suspect's residence and then seeking the resident's consent to search. (Tr. 43)

cers continued toward the garage area and were greeted by Carmine Cota–Lopez ("Carmine"), Defendant Melchor's wife, who had opened a screen door to address them as they approached the garage. (Tr. 14, 39–40, 89) After Carmine greeted the officers, they entered the garage area and identified themselves by showing their police badges. (Tr. 39, 42) The officers explained to Carmine that they were conducting a narcotics investigation and then asked for permission to enter the house to further discuss their investigation. Carmine took Detective Gutierrez's badge and invited the officers to enter the Residence. (Tr. 16, 89–90) The officers did not search the garage area at that time, and no evidence or contraband was seized from the garage as a result of the officers' approach to the garage.

13. Carmine informed the officers that she lived in the Residence with her husband. She then asked the officers to wait in the dining room area while she went to retrieve her husband from one of the bedrooms. (Tr. 17) Carmine walked down the hallway and entered the master bedroom, and a few moments later, both Carmine and Defendant Melchor walked out to meet with the officers. (Tr. 18–19)

14. Although Detective Serrano did most of the talking, Detective Gutierrez could at all times overhear their discussion as he performed a visual sweep of the area inside the Residence. (Tr. 19) Sgt. Silex did not interact with the occupants of the Residence. Sgt. Silex was only present to protect the officers. (Tr. 21)

15. Detective Serrano informed Defendant Melchor that they were conducting a narcotics investigation and asked for consent to search the Residence.[6] (Tr. 93–94) According to Detective Gutierrez, Carmine's demeanor and speech during this initial encounter were deliberate, cautious, precise, and reserved, while Defendant Melchor's was excited, high-pitched, and quick. (Tr. 15, 19) Detective Serrano also noticed that Defendant Melchor was "visibly shaken" and sweating, and it appeared as if Defendant Melchor was out of breath (due either from physical exertion or nervousness). (Tr. 92)

16. Defendant Melchor informed the officers that he had been living in the house for the past two years with his family, but that his uncle was the actual leasee of the Residence. (Tr. 27, 93) Defendant Melchor also indicated that several relatives had been visiting him and were in the Residence at the time. Defendant Melchor then walked down the hallway to another bedroom and asked several people (Defendant Melchor's mother, sister, brother, and child) to wait in the living room area. (Tr. 20–21) Detective Gutierrez positioned himself in an area between the living room and dining room which allowed him to maintain visual contact with the people in the living room and to talk with Carmine, who during this time returned Detective Gutierrez's badge to him. (Tr. 21–22)

---

**6.** During the investigation, the officers spoke Spanish to the suspects, but spoke English to one another. (Tr. 97, 155)

17. Defendant Meclhor thereafter resumed his conversation with Detective Serrano. Defendant initially responded to the officers' request for consent to search by asking if the officers had a search warrant. (Tr. 93–94) During this exchange, Officer Vega informed Detective Gutierrez that he had a positive dog "alert" on the Residence. (Tr. 22–23, 95) Detective Gutierrez relayed this information to Detective Serrano who was engaged in a conversation with Defendant Melchor. (Tr. 23) Detective Serrano then told Defendant Melchor that the officers did not have a search warrant, but that they had a "hit" on the Residence from a canine which would probably be enough information to establish probable cause in order to secure a warrant if they wanted. (Tr. 23, 95–96) Detective Serrano also explained to Defendant Melchor that if he did not feel comfortable giving consent to the search that the officers would leave and secure a search warrant. (Tr. 95) Defendant Melchor did not explicitly request or demand that the officers not search the Residence. (Tr. 76, 138)

18. Defendant Melchor then told the officers that he wanted to speak with them alone and led them into another bedroom, a third bedroom near the master bedroom which was later identified as Defendant Melchor's bedroom. (Tr. 23, 96) Inside that bedroom, Defendant Melchor explained that there was "something" in the house that he thought might be drugs, and that he wanted to show it to the officers. (Tr. 24, 97) Defendant Melchor then sought a guarantee from the officers that his relatives would not be arrested. (Tr. 26, 97) Detective Serrano told Defendant Melchor that he had to complete his investigation before he could make a determination regarding the involvement of the others living at the Residence. (Tr. 97) Although Defendant Melchor never specifically gave consent to search the Residence, he voluntarily led the officers to the master bedroom and showed them several boxes, which he indicated contained cocaine. (Tr. 24, 100) The officers observed at least one open box filled with several "bricks" wrapped in electrical tape, which later field tested positive for cocaine. (Tr. 24, 55, 175) At that point, Defendant Melchor was given his *Miranda* warnings. (Tr. 24–25, 98–99, 102) From that point on, the officers would not have permitted him or the other people inside the Residence to leave. (Tr. 111)

19. In addition to the boxes containing the cocaine, the master bedroom contained a futon and bedding, as well a shoe box with plastic food sealer and two suitcases, one of which was partially open. (Tr. 57, 59) Defendant Melchor informed the officers that the suitcases belonged to Defendant Jose and Defendant Urias, who he claimed had been staying in the master bedroom at the Residence for approximately one week prior to that date. (Tr. 29, 57)

20. Defendant Melchor was cooperative and continued to assist the officers even after he was given his *Miranda* warnings. During this time, Defendant Melchor was not handcuffed, none of the officers brandished their weapon, and there is no indication that any of the officers' requests were made in an intimi-

dating manner. (Tr. 30) Defendant Melchor pointed out the location of other cocaine inside the closet of the master bedroom, as well as a drug ledger in his bedroom. (Tr. 26–28, 166) Defendant Melchor at no time indicated that any area of the Residence, including the master bedroom, was off limits to the officers. (Tr. 102)

21. The officers then conducted a more detailed search of the master bedroom, including the closet. Inside the closet, the officers discovered several boxes containing bundles wrapped in black electrical tape (later identified as cocaine), plastic bags, plastic food sealer, a food saver sealing machine, gloves, knives and other drug packing paraphernalia. (Tr. 59–60, 103) Approximately eight hundred sixty-five pounds of cocaine and "a lot of cash" were discovered in the master bedroom. (Tr. 101, 169)

22. Defendant Melchor had complete access to the Residence without locks, restrictions, or barriers of any kind. In particular, the door to the master bedroom did not have a lock and was freely accessible to Defendant Melchor, as was indicated by his presence in the master bedroom when the officers first entered the Residence. (Tr. 18–19) Although the closet door had a lock, the closet door was open and the key to the closet door was in a deadbolt lock, which was inside the closet with the boxes of cocaine and other drug paraphernalia. (Tr. 29, 76, 80)

23. The officers searched the suitcases in the master bedroom without a warrant or consent from Defendant Jose or Defendant Urias. (Tr. 120) Inside the suitcases, the officers discovered a group photograph of Defendant Melchor, Defendant Urias, Guillermo, and an infant child. (Tr. 170) The officers also found various immigration papers belonging to Defendant Jose and Defendant Urias, including Defendant Urias's passport. (Tr. 29, 70)

24. Upon discovery of the cocaine (at approximately 5:45 p.m.), Defendant Jose and Defendant Urias were transported to the Residence (Tr. 70) At the Residence, Detective Gutierrez gave them their *Miranda* warnings. Although Defendant Jose and Defendant Urias initially remained silent, they did not invoke their constitutional right to an attorney and subsequently responded to questions posed by Detective Gutierrez. (Tr. 71–72). Defendant Jose and Defendant Urias again denied they had come from the Residence, and both denied having been at the Residence or having any knowledge about it. (Tr. 72)

25. After the initial search, Agent Hightower obtained a search warrant from a local magistrate judge. Agent Hightower searched the Residence again with the search warrant sometime after May 13, 2002. (Tr. 169)

## II. ANALYSIS

The Government in this case argues that the "consensual search exception" justifies the warrantless entry into the Residence. Specifically, the Government contends that Defendant Melchor freely consented to the search of the Residence, and that all subsequent actions within the Residence were also consensual through Defendant Melchor's initial consent. The Government further asserts that Defendant Jose and

Defendant Urias lack standing to contest the search and seizure. Alternatively, with respect to Defendant Jose and Defendant Urias, the Government contends that the contraband should not be suppressed because the officers had consent to search the Residence, including the master bedroom, and because of the "independent source" doctrine.[7]

On the other hand, Defendant Melchor, Defendant Jose, and Defendant Urias (the "Defendants") insist that the officers' initial entry into the Residence without a warrant was violative of their Fourth Amendment rights, and that, any evidence discovered during the subsequent search should be suppressed as "fruit" of this illegal entry. Specifically, Defendants contend that the evidence seized at the Residence, including the eight hundred sixty-five pounds of cocaine, should be suppressed because the evidence was initially discovered by the officers during their illegal entry through the attached garage of the Residence. Defendants also assert that the canine sniff at the front door of the Residence was an illegal search under the Fourth Amendment. Defendants further argue that the permission for the search and seizure was neither freely nor voluntarily given. Defendant Jose and Defendant Urias also maintain that they have standing to challenge the search and seizure pursuant to *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Defendant Jose and Defendant Urias further contend that the traffic stop performed by Officer Vega was illegal and that any statements made at the stop scene or at the Residence where Defendant Jose and Defendant Urias were given their *Miranda* warnings were improperly obtained, and therefore tainted under the Fourth Amendment. Finally, Defendant Jose and Defendant Urias contend that the contents of the two suitcases in the master

bedroom, along with the cocaine and drug paraphernalia, should be suppressed since they did not consent to the search and seizure performed at the Residence despite the fact that the officers knew they were staying in the master bedroom and that the suitcases belonged to them.

### A. Standing Under the Fourth Amendment

■ The initial inquiry must be whether Defendant Jose and Defendant Urias have standing to contest the search and seizure at the Residence. Whether a defendant's Fourth Amendment rights have been violated by an unlawful search turns on his "legitimate expectation of privacy" in the area searched. *U.S. v. Meyer*, 656 F.2d 979, 981 (5th Cir.1981) (citing *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)) The Government asserts that Defendant Jose and Defendant Urias have no standing to contest the search or seizure of the evidence found in the suitcases or the master bedroom because they had no expectation of privacy in the Residence. Defendant Jose and Defendant Urias, as movants, must show that they had an expectation of privacy in the invaded place and that the expectation was legitimate, one that society is prepared to recognize as reasonable. *See Katz v. U.S.*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *Rakas*, 439 U.S. at 140–41, 99 S.Ct. 421; *U.S. v. Paulino*, 850 F.2d 93 (2d Cir.1988). It is well settled that "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Olson*, 495 U.S. at 91, 110 S.Ct. 1684 (citing *Rakas*, 439 U.S. at 143, 99 S.Ct. 421). "In general, a person who is aggrieved by an illegal search and seizure

---

7. *See* discussion *infra* Part II.B.4.

only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *U.S. v. Wilson,* 36 F.3d 1298, 1302 (5th Cir.1994); *see also Andrews v. Cain,* 71 F.Supp.2d 560, 567 (E.D.La.1999) ("[I]t is well-established that a person who challenges the introduction of damaging evidence secured by a seizure of a third person's property in which he has no legitimate expectation of privacy has not had any of his Fourth Amendment rights infringed."). Once the defendants produce evidence that the search and seizure was warrantless (*i.e.* that there is indeed a privacy interest), the government has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement. *See* discussion *infra* Part II.B.; *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Wilson,* 36 F.3d at 1302 (citing *U.S. v. de la Fuente,* 548 F.2d 528, 533 (5th Cir.1977)).

In order to have Fourth Amendment standing, a defendant must show: (1) an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and (2) that the expectation is one that society would recognize as reasonable. *See U.S. v. Thomas,* 120 F.3d 564, 571 (5th Cir.1997); *Wilson,* 36 F.3d at 1302; *see also U.S. v. Doe,* 801 F.Supp. 1562, 1572 (E.D.Tex.1992) (citing *U.S. v. Lee,* 898 F.2d 1034, 1037–1038 (5th Cir.1990)). Defendant Jose and Defendant Urias assert that, under *Olson,* they have standing. The Court agrees. The language used by the Supreme Court in *Olson* is broad. In particular, *Olson* states that "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Olson,* 495 U.S. at 96–97, 110 S.Ct. 1684.

In the instant case, Defendant Melchor lived in the Residence and had lived there for approximately two years. Defendant Juan Carlos and Defendant Jose Clemente were overnight guests in Defendant Melchor's home, and had apparently been staying there for approximately one week. Thus, Defendant Jose and Defendant Urias had an *Olson* expectation of privacy and they may therefore challenge the search and seizure of the residence. Accordingly, the Court finds that due to the *Olson* expectation of privacy, Defendant Jose and Defendant Urias have discharged their burden to show that they have standing to challenge the search and seizure of the cocaine and drug paraphernalia, as well as the contents of the suitcases found in the master bedroom. The burden thus shifts to the Government to justify the warrantless search and seizure of the Residence.

### B. Suppression Due to Warrantless Search and Seizure?

The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The underlying purpose of the Fourth Amendment is to protect and shield citizens from unwarranted intrusions into their private domain. One has a reasonable expectation of privacy in the sanctuary of his home and is entitled to Fourth Amendment protection. *See Katz,* 389 U.S. at 347, 88 S.Ct. 507. The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *U.S. v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *U.S. v.*

*Capote–Capote,* 946 F.2d 1100 (5th Cir. 1991). As a result, warrantless searches and seizures are *per se* unreasonable except those falling within a few narrowly defined exceptions. *See Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Katz,* 389 U.S. at 356–57, 88 S.Ct. 507; *U.S. v. Cardenas,* 9 F.3d 1139, 1147 (5th Cir.1993); *U.S. v. Niver,* 689 F.2d 520, 525 (5th Cir.1982). There are several exceptions to the probable cause and warrant requirements, including investigatory detentions, searches incident to a valid arrest, seizure of items in plain view, exigent circumstances, consent searches, vehicle searches, container searches, and searches in which the special needs of law enforcement make the probable cause requirement impracticable. *See Tamez v. City of San Marcos,* 118 F.3d 1085, 1089 (5th Cir.1997). Since a warrantless search is presumed to be unreasonable, the government has the burden of proving that the warrantless search was conducted pursuant to an exception. *See Coolidge,* 403 U.S. at 443, 91 S.Ct. 2022; *U.S. v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951).

1. *Whether the officers' entry into the open attached garage violated Defendants' Fourth Amendment rights.*

██ Defendants assert that the "entry" into the Residence occurred when the officers entered the garage, and the alleged consent they obtained after that entry cannot be used to justify their subsequent entry into the remainder of the Residence. Defendants contend that since the garage was attached to the house, it is entitled to the same Fourth Amendment protection as the Residence. The crucial question, then, is whether this "entry" falls under the purview of the Fourth Amendment, and, if so, whether the entry comes within a recognized exception to the Fourth Amendment.

The Court agrees with Defendants that the attached garage is part of the Residence, and as a consequence, it is entitled to the same Fourth Amendment protection as the remainder of the Residence. It is well established that the Fourth Amendment's protection is extended to garages. *See Taylor v. U.S.,* 286 U.S. 1, 6, 52 S.Ct. 466, 76 L.Ed. 951 (1932) (holding that search of garage without a warrant violated the Fourth Amendment); *see also U.S. v. Oaxaca,* 233 F.3d 1154, 1157 (9th Cir. 2000) ("[There is] no reason to distinguish a garage, where people spend time, work, and store their possessions, from a den or a kitchen, where people spend time, work, and store their possessions. Simply put, a person's garage is as much a part of his castle as the rest of his home."); *see generally* 1 LAFAVE, SEARCH AND SEIZURE, § 2.3 (3rd ed. 1996) ("Under *Katz,* it is a search to violate 'the privacy upon which [one] justifiably relied,' and unquestionably a person can have such an expectation of privacy as to garages and barns and the like even when they are not in 'close proximity' to his dwelling.").

Nevertheless, considering all the facts surrounding the officers' entry into the open garage attached to the Residence, the Court concludes that their entrance into the garage was entirely reasonable, and did not violate the Fourth Amendment. The officers in this case were conducting a "knock and talk" which must be based upon the premises occupant's valid consent to the search of the premises. It cannot be questioned, therefore, that the officers were justified in seeking to enter the residence, by knocking on a door to seek permission to perform such a search. In entering the open garage, the officers merely took one of two alternative methods of getting to the Residence (the inner

garage door or front door). In this instance there was no direct path from the street to the front door, which therefore required the officers to walk up the driveway to the garage area in order to approach the Residence. Moreover, the Residence had no fences, gates, "keep out" signs, or any other barriers, and at the time of the officers' approach the garage door was open and the garage area was visible to the public at large. The uncontroverted evidence before the Court indicates that, when Detective Serrano, Detective Gutierrez, and Sgt. Silex approached the Residence and before they entered the garage, they could see Carmine behind the screen door of the inner garage door (the entrance to the main part of the Residence). Carmine, in greeting the officers, opened the door to address them and they continued into the garage area. Obviously, this was not an unannounced entry, but rather a mutual encounter between the parties. At a minimum, Carmine impliedly consented to the officers' entry into the garage.

Furthermore, Defendants do not argue that the officers, while in the garage, actually gained additional evidence by which they seek to justify the subsequent entry into the Residence (i.e. the existence of an exigent circumstance). In fact, no search was conducted of the garage at that time, and no evidence or contraband was seized from the garage as a result of the officers' approach to the garage. Indeed, both Detective Serrano and Detective Gutierrez testified during the suppression hearing that they obtained no information while in the garage, a period of presumably no more than thirty seconds before they were given permission to enter the Residence. The officers merely asked Carmine whether they could come inside the Residence to further discuss the details of their investigation.

Finally, the fact that the garage door was open, and the garage area and its contents were almost entirely exposed and accessible to anyone, including the officers walking towards the Residence, only makes the case all the more clear. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz*, 389 U.S. at 351–52, 88 S.Ct. 507 (citations omitted). In this instance, the garage door was willingly left wide open, and the officers approaching the Residence were able to see inside the garage area. The officers could even see Carmine, who was standing behind a partially opened screen door. A person standing in the doorway of a home is as "exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *U.S. v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). In those places, and thus in an open doorway, under these circumstances, the officers' "entry" does not violate the Fourth Amendment. *See Santana*, 427 U.S. at 42, 96 S.Ct. 2406 (an individual voluntarily standing in the threshold of her home i.e., in the middle of an open doorway is outside rather than inside the home for purposes of the Fourth Amendment). Obviously, Carmine was aware of the officers' presence and she certainly could have requested the officers to leave the garage area, or alternatively she could have closed the garage door entirely upon their approach had she not wanted the officers to enter through the garage. Instead, Carmine chose to voluntarily greet the officers, which, under the circumstances, any reasonable person would have taken to mean that Carmine acquiesced to the entry of the officers (who at that time had

not yet identified themselves as officers acting under color of authority).

Accordingly, the Court concludes that, under the unique and limited circumstances presented in this case, the entry into the garage area by Detective Serrano, Detective Gutierrez, and Sgt. Silex does not implicate the Fourth Amendment.

### 2. Whether the canine sniff at the front door of the Residence was a "search" under the Fourth Amendment.

■ Defendants also argue that the canine sniff at the front door of the Residence was a search under the Fourth Amendment because of Defendant Melchor's heightened expectation of privacy in his residence.

The Fifth Circuit has yet to consider the issue in the context presented here, although it has, in no uncertain terms, stated "[a] dog 'sniff' is not a search." *U.S. v. Seals*, 987 F.2d 1102, 1106 (5th Cir.1993). Moreover, other federal circuits and other courts within the Fifth Circuit have rejected Defendants' contention. *See e.g., U.S. v. Marlar*, 828 F.Supp. 415, 419 (N.D.Miss. 1993) (canine sniff of an exterior motel room door opening onto a public sidewalk and parking lot, did not intrude on defendant's reasonable expectation of privacy and therefore did not constitute a search within the meaning of the Fourth Amendment); *U.S. v. Reed*, 141 F.3d 644, 650 (6th Cir.1998) (canine sniff is not a search within the meaning of the Fourth Amendment no matter where the sniff takes place); *U.S. v. Cook*, 1990 WL 70703, at *3–5 (6th Cix.1990) (Guy, J., concurring); *see also U.S. v. Colyer*, 878 F.2d 469, 475 (D.C.Cir. 1989) ("[n]o legitimate expectation of privacy is impinged by governmental conduct that can 'reveal nothing about noncontraband items.'") (citations omitted); *U.S. v. Lingenfelter*, 997 F.2d 632, 638 (9th Cir. 1993) (canine sniff outside drug suspect's commercial warehouse did not constitute "search," and thus neither warrant, nor probable cause, nor reasonable suspicion was required); *U.S. v. Tarazon–Silva*, 960 F.Supp. 1152, 1162–63 (W.D.Tex.1997) (holding that dog sniff of dryer vent of house was not a search), *aff'd*, 166 F.3d 341 (5th Cir.1998); *but cf. U.S. v. Thomas*, 757 F.2d 1359 (2d Cir.1985) (canine sniff conducted at the door of a person's dwelling was search requiring warrant based on probable cause).

*Thomas* seems to stand alone in its pronouncement that a canine sniff may constitute an unreasonable search. According to the *Thomas* Court, the heightened privacy interest in a dwelling place renders a canine sniff intrusive on the inhabitant's expectation of privacy, even with respect to contraband. *See id.* at 1366–67. This Court rejects the *Thomas* Court's holding as it ignores the Supreme Court's determinations in *U.S. v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) and *U.S. v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) which stand for the proposition that a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed. In short, there is no legitimate interest in "privately" possessing cocaine. *See Jacobsen*, 466 U.S. at 123, 104 S.Ct. 1652. Accordingly, the Court finds, under the facts of this case, that *Place* and *Jacobsen* compel the conclusion that a canine sniff capable of detecting only the presence or absence of contraband is not a search within the meaning of the Fourth Amendment.

### 3. Whether Defendant Melchor's consent was valid under the Fourth Amendment.

■ Warrantless searches are not unreasonable under the Fourth Amendment if consent is given to conduct them. *See U.S. v. Jenkins*, 46 F.3d 447, 451 (5th

Cir.1995); *See also Schneckloth*, 412 .U.S. at 222, 93 S.Ct. 2041 (holding that a warrantless search pursuant to a valid consent is constitutionally permissible). A consensual search is one of the established and well-delineated exceptions to both the warrant and probable cause requirements. *Schneckloth*, 412 U.S. at 219, 93 S.Ct. 2041 (*citing Davis v. U.S.*, 328 U.S. 582, 593–94, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946)); *See also U.S. v. Patrone*, 948 F.2d 813, 815–16 (1st Cir.1991). When relying on the consensual search exception, the government must prove, by a preponderance of the evidence, that consent was freely and voluntarily given. *See U.S. v. Tompkins*, 130 F.3d 117, 121 (5th Cir.1997); . *U.S. v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993); *U.S. v. Kelley*, 981 F.2d 1464, 1470 (5th Cir.1993); *Pineda v. City of Houston*, 124 F.Supp.2d 1057, 1070 (S.D.Tex.2000). Consent to a warrantless search must be voluntary and may be express or implied. *U.S. v. Jaras*, 86 F.3d 383, 390–91 (5th Cir.1996) (consent cannot reasonably be implied from a suspect's silence or failure to object unless the officer expressly or impliedly asked for consent). Consent to a warrantless search may be implied by the circumstances surrounding the search or by a person's failure to object to the search. *See U.S. v. Varona–Algos*, 819 F.2d 81, 83 (5th Cir.1987), *overruled on other grounds by, Jaras*, 86 F.3d 383 (5th Cir.1996); *Johnson v. Smith County*, 834 F.2d 479, 480 (5th Cir.1987) (evidence was sufficient to establish that homeowner at least implicitly consented to warrantless search of home by armed police officers, notwithstanding homeowner's claim that there was no indication as to who within home gave negative response when police officers asked "Do you mind us looking?"); *see also U.S. v. Banks*, 2002 WL 1611642, *5 (E.D.La.2002) (defendant's statement to law enforcement officers that he had a handgun underneath his bed mattress was an implied consent to search, where it was

objectively reasonable for officers to believe they had defendant's consent to search for and seize gun, and defendant did not object to search). However, the government's burden of proving voluntariness of consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority."); *U.S. v. Lopez*, 911 F.2d 1006, 1010 (5th Cir.1990) (it must be shown that the consent was not given "simply in acquiescence to a claim of lawful authority") (citations omitted). "The standard for measuring the scope of the suspect's consent is objective reasonableness. Recitation of magic words is unnecessary; the key inquiry focuses on what the typical reasonable person would have understood by the exchange between the officer and the suspect." *U.S. v. Stewart*, 93 F.3d 189, 192 (5th Cir.1996). Finally, the prosecution must show that either the defendant consented to the search or that consent was obtained from a third party that had the ability to furnish valid consent. *See U.S. v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

The voluntariness of the consent is a question of fact to be determined from the totality of the circumstances surrounding the search. *See Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (citing *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. 2041); *U.S. v. Davis*, 749 F.2d 292, 294 (5th Cir.1985). In *Schneckloth*, the Supreme Court noted:

In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, *account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.* Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches. 412 U.S. at 229, 93 S.Ct. 2041 (emphasis added). Consent will be found voluntary if after considering all the circumstances then obtaining, it may be established that it was "the product of an essentially free and unconstrained choice by its maker." *Schneckloth,* 412 U.S. at 224, 93 S.Ct. 2041. There are several factors to be considered relating to voluntariness: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *See Kelley,* 981 F.2d at 1470; *See also U.S. v. Tedford,* 875 F.2d 446, 451–52 (5th Cir.1989); *U.S. v. Olivier–Becerril,* 861 F.2d 424, 426 (5th Cir.1988) (citations omitted). Although all six factors are relevant, "no single factor is dispositive or controlling of the voluntariness issue." *Olivier–Becerril,* 861 F.2d at 426.

### (a) Implied Consent

■ Indeed, consent to search a home is not to be lightly inferred. However, under the circumstances presented in this case, the Court finds that Defendant Melchor's consent to a search of the Residence can be inferred from his conduct. Defendant Melchor did not merely acquiesce to a showing of lawful authority, but rather impliedly consented to the search by identifying the exact location of the cocaine in the master bedroom.

In this instance, the officers expressly asked for permission to enter and search the Residence. Defendant Melchor did not respond with silence, rather he conversed with the officers and even brought the officers into one of the bedrooms and explained that there was "something" in the house that he thought to be drugs, and that he wanted to show it to the officers. Although Defendant Melchor never explicitly gave consent to search the Residence, he voluntarily led the officers to the master bedroom and showed them several boxes of cocaine, and further assisted the officers in locating other cocaine and drug paraphernalia. Detective Gutierrez and Detective Serrano testified that they understood Defendant Melchor's statements and actions to mean that narcotics were in the Residence and that they had Defendant Melchor's permission to seize the contraband. Moreover, Defendant Melchor did not object to the search. In light of all the circumstances, this Court finds that it was objectively reasonable for the officers to believe that they had Defendant Melchor's consent to search for and seize the cocaine in the master bedroom of the Residence, a location Defendant Melchor identified. Thus, Defendant Melchor's statements and affirmative actions constituted more than mere acquiescence and provided the officers with a reasonable belief that they received consent to search the Residence. *See U.S. v. Shannon,* 21 F.3d 77, 82, n. 1 (5th Cir.1994) (holding that the defendant's identification of the exact location of a gun led the officers to reasonably believe in good faith that defendant had consented to their entry into defendant's motel room and their seizure of defendant's weapon).

### (b) Voluntariness of Consent.

■ Similarly, in applying the relevant factors to the factual scenario at hand, this Court finds that they militate in favor of a finding that Defendant Melchor voluntarily

consented to the search of the Residence, including the master bedroom.

### (1) Custodial status

The Court determines that Defendant Melchor's custodial status was voluntary. *See Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). The encounter between the officers and Defendant Melchor remained consensual until the search revealed the presence of cocaine and drug paraphernalia, at which point Defendant Melchor was given his *Miranda* warnings and formally detained. In fact, Detective Serrano indicated at the suppression hearing that the officers would have left the Residence (prior to Defendant Melchor's admission of the presence of the cocaine) and returned with a warrant had Defendant Melchor requested that they do so. In short, there is no evidence upon which it could reasonably be concluded that Defendant Melchor was in any form of custodial status when he initially consented to cooperate with the officers.

### (2) Coercive police procedures

In this case, there is no evidence that the officers used coercive tactics, or that they took unlawful advantage of the situation to obtain Defendant Melchor's consent, *i.e.* Defendant Melchor was not handcuffed, no threats or violence were used, and there was no overt display of authority. Further, there is no indication that the officers' requests were made in an intimidating manner. The absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent. *See*

*U.S. v. Jones,* 475 F.2d 723 (5th Cir.1973); *Cockerham v. Wainwright,* 444 F.2d 438 (5th Cir.1971); *U.S. v. Thompson,* 421 F.2d 373 (5th Cir.1970); *U.S. v. Boukater,* 409 F.2d 537 (5th Cir.1969). Although the circumstances surrounding the search scene could arguably have been nerve racking, nervousness of the defendant alone does not preclude a finding of voluntariness. *See U.S. v. Galberth,* 846 F.2d 983, 988 (5th Cir.1988). Moreover, Defendant Melchor's will was not overborne by the number of agents present at the search scene. The Fifth Circuit has held consent to be voluntary even in the face of greater shows of force than the presence here of approximately four agents, none with weapons drawn or displaying force beyond their presence in numbers. *See U.S. v. Solis,* 299 F.3d 420, 438 (5th Cir. 2002) (presence of seven police officers at defendant's residence when he signed form consenting to search was not shown to have overborne defendant's will.); *see also U.S. v. Gonzales,* 121 F.3d 928, 939 (5th Cir.1997); *Jones,* 475 F.2d at 723.

### (3) Cooperation with the police

Defendant Melchor in this instance was very cooperative with the officers, and even continued to assist the officers after having been given his *Miranda* warnings. Not only did Defendant Melchor point out the location of other cocaine inside the closet of the master bedroom, as well as a drug ledger in his bedroom, he answered many of the officers' questions, and even volunteered information regarding his uncle's role in the drug operation. Consequently, the lack of any antagonism on the part of Defendant Melchor militates in favor of a finding of consent.

### (4) Awareness of the right to refuse consent

The Court finds that the officers failed to inform Defendant Melchor that he need not consent. However, there is no abso-

lute requirement that the government establish that Defendant Melchor knew he could refuse; it is merely one of the factors. *See Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent."); *see also Davis,* 749 F.2d at 296 ("Proof of knowledge of the right to refuse consent is not required to show voluntariness."). Moreover, the officers made Defendant Melchor aware that his cooperation was strictly voluntary. As noted above, Detective Serrano explained to Defendant Melchor that if he did not feel comfortable giving consent to the search that the officers would leave to secure a search warrant. Based on the other details of Defendant Melchor's cooperation, and the fact that he was specifically informed that his cooperation was voluntary, the fact that he may not have been specifically told "you may refuse to cooperate" does not support a finding of involuntariness. *See Jenkins,* 46 F.3d at 453 (the fact that defendant may not have been specifically told "you may refuse to cooperate" does not provide much, if any, indicia of involuntariness).

#### (5) *Intelligence and education*

The Court notes that there is no evidence that Defendant Melchor was of below average intelligence or that he was otherwise deficient in his ability to understand the officers. Moreover, Defendant Melchor has produced no witnesses putting in question his intellectual endowments, nor has he ever denied that he understood the warnings given him. Furthermore, based upon the conversation between Defendant Melchor and the officers, it is apparent that Defendant Melchor un-

derstood the officers. The evidence presented simply does not indicate that he was lacking the requisite education or intelligence to give valid consent to a search. This factor, therefore, weighs against Defendant Melchor.

#### (6) *Belief that no incriminating evidence will be found.*

The Court finds Defendant Melchor was aware that the agents would find the incriminating evidence of cocaine and drug paraphernalia inside the Residence, as evidenced by his request for a warrant and the extent and visibility of the cocaine packing operations inside the Residence, which were in plain site in the master bedroom. Although this factor generally militates against a finding of voluntary consent, the Court notes that Defendant Melchor could have consented in part because he knew the agents would find the cocaine and drug paraphernalia, or he could have consented in the hope that his cooperation would result in more favorable treatment (a request he actually made to the officers with respect to his family members). Hence, in light of the totality of the circumstances, the Court finds that this factor is not sufficiently significant to convince the Court that Defendant Melchor's consent was involuntarily given.

■ Based on the six factors discussed above, the Court finds that Defendant Melchor voluntarily consented to having the officers search the Residence. Thus, with respect to Defendant Melchor, the consent was valid, and therefore rids the warrantless search of any taint. Consequently, the Court finds that Defendant Melchor's Motion to Suppress I and Motion to Suppress II due to warrantless entry and search is without merit.[8]

---

**8.** Defendant Melchor also contends that any incriminating statements made by him are inadmissible because they were obtained in violation of the Fifth Amendment pursuant to

*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court disagrees with this contention. Defendant Mel-

**4. Whether Defendant Melchor lacked the authority to permit officers to search the master bedroom and suitcases.**

■ The Constitution does not guarantee that a citizen will never be subjected to any search, but rather that a citizen is entitled to be free from unreasonable searches. *See Illinois v. Rodriguez*, 497 U.S. 177, 183–84, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *Jenkins*, 46 F.3d at 454. "What [a suspect] is assured by the Forth Amendment itself, however, is not that no government search of his house will occur unless he consents; but that no such search will occur that is 'unreasonable.'" *Rodriguez*, 497 U.S. at 183–84, 110 S.Ct. 2793 (citations omitted). As discussed above, a search conducted pursuant to consent is an exception to the Fourth Amendment's warrant requirement. *See Jenkins*, 46 F.3d at 451. Moreover, the Supreme Court has held that the Fourth Amendment does not have to be waived

chor's pre-*Miranda* statements were made in response to the "knock and talk" performed by the officers, and should not be suppressed because Defendant Melchor was not in "custody" at the time. As noted above, the encounter between the officers and Defendant Melchor remained consensual until the search revealed the presence of cocaine and drug paraphernalia, at which point Defendant Melchor was given his *Miranda* warnings and formally detained. The "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (citations omitted); *see also Orozco v. Texas*, 394 U.S. 324, 326–27, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). Under the circumstances, the Court finds that no custodial situation requiring *Miranda* warnings was created until the officers found drugs in the master bedroom and thus had probable cause to arrest him. *See U.S. v. Cormier*, 220 F.3d 1103, 1112 (9th Cir.2000) (finding that the defendant who voluntarily consented to a search of his motel room by a police officer, who obtained access through the "knock and talk" procedure, was not in custody for *Miranda* purposes); *see also U.S. v. Zertuche–Tobias*, 953 F.Supp. 803 (S.D.Tex. 1996) (holding that officers' knocking on front door and requesting to talk to suspect, which was referred by the police as a "knock and talk," was a non-custodial interrogation and did not otherwise implicate Fourth Amendment); *U.S. v. Ponce Munoz*, 150 F.Supp.2d 1125, 1134 (D.Kan.2001) (finding that the defendant's freedom of action was not curtailed in any significant way during initial encounter requiring *Miranda* warnings when the defendant allowed officers into his residence and voluntarily conversed with them about their investigation). Therefore, any pre-*Miranda* statements are not suppressible. Similarly, any post-*Miranda* statements by Defendant Melchor should not be suppressed. The post-*Miranda* statements were taken at the Residence after Defendant Melchor was given his *Miranda* warnings by Detective Gutierrez which was based upon the discovery of the cocaine. A suspect may waive his *Miranda* rights provided the waiver is knowingly and intelligently made. *See Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *see also* discussion *infra* Part II.B.5. All that the prosecution must show is that the suspect was effectively advised of his rights and that he then intelligently and understandingly declined to exercise them. *See Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962). In this instance, Defendant Melchor did not invoke his right to remain silent, nor did he invoke his right to an attorney. Rather, Defendant Melchor readily cooperated with the officers in their investigation, pointing out the exact location of the cocaine and drug paraphernalia, as well as providing general information about the drug operation at the Residence. Moreover, the evidence established that at no time during the encounter with Defendant Melchor did the officers use a threatening tone, physically touch Defendant Melchor, threaten physical punishment, draw their service weapons, or subject Defendant Melchor to intimidating or prolonged questioning. Additionally, Defendant Melchor did not appear to be of limited intelligence, incoherent, or intoxicated by any substance. Under the facts presented, the Court finds that Defendant Melchor knowingly and intelligently waived his right to remain silent, as well as his right to counsel. Accordingly, none of the statements by Defendant Melchor are suppressible.

through a "knowing and intelligent" waiver by the person asserting the right. *See Schneckloth,* 412 U.S. at 241, 93 S.Ct. 2041. Consent to search, therefore, need not be given by the defendant himself in every circumstance. A third party may consent to a warrantless search, since "knowing and intelligent" waiver is not required by the individual whose right is being waived. *See Jenkins,* 46 F.3d at 454 ("Since a 'knowing' and 'intelligent' waiver is not required by the individual whose right is being waived, there is no prohibition against a third party waiving that right by granting consent to search."); *see also Matlock,* 415 U.S. at 171, 94 S.Ct. 988.

"In the context of searches, it is well established that the police may conduct a warrantless search of an area without running afoul of the Fourth Amendment if a third party with common control over the area consents to the search." *U.S. v. Hernandez–Zuniga,* 215 F.3d 483, 487 (5th Cir.), *cert. denied,* 531 U.S. 1038, 121 S.Ct. 628, 148 L.Ed.2d 537 (2000). When the government seeks to justify a warrantless search on the theory that consent was lawfully obtained from a third party, rather than from the person whose property was searched or seized, the government bears the burden of proving that the third party had either actual or apparent authority to consent. *See Gonzales,* 121 F.3d at 938; *Jenkins,* 46 F.3d at 454; *see also U.S. v. Hughes,* 441 F.2d 12, 17 (5th Cir. 1971) ("[W]here two persons have equal rights to the use or occupation of the premises, either may give consent to a search, and the evidence thus disclosed may be used against either."); *Thompson,* 421 F.2d at 375; *Gurleski v. U.S.,* 405 F.2d 253, 262 (5th Cir.1968). To establish that a third party had actual authority to consent, the government must demonstrate "mutual use of the property by persons generally having joint access or control for most purposes." *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. 988; *see also U.S. v. Richard,*

994 F.2d 244, 250 (5th Cir.1993) (third party can consent to a search if he has "common authority" over the premises). To establish that a third party had apparent authority to consent, however, the government need demonstrate only that the officers reasonably believed that the third party was authorized to consent. *See Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793.

In this case, the evidence shows that Defendant Melchor had the authority (both actual and apparent) to consent to a search of the Residence, including the master bedroom and that his authority extended to the items seized in the master bedroom, with the exception of the suitcases. As noted above, a finding of actual authority requires proof that the consenting party and the party challenging the search "mutually used the property searched and had joint access to and control of it for most purposes, so that it is reasonable to recognize that either user had the right to permit inspection of the property and that the complaining co-user had assumed the risk that the consenting co-user might permit the search." *U.S. v. Rizk,* 842 F.2d 111, 112–13 (5th Cir.1988) (per curiam). Under this test, Defendant Melchor's authority over the premises was sufficient to justify the search made pursuant to his consent. He and his family had been living in the Residence for approximately two years. Although the Residence was not rented in Defendant Melchor's name, he obviously had complete control of and access to the Residence without limitations, locks, restrictions, or barriers of any kind. In particular, the door to the master bedroom did not have a lock and was freely accessible to Defendant Melchor, as was indicated by his presence in the master bedroom when the officers first entered the Residence. Although the closet door had a lock, the closet door was open and the key to the closet door was in a deadbolt lock which was inside the closet (which was presumably put there by Defendant Mel-

chor prior to the officers' arrival) with the boxes of cocaine and other drug paraphernalia. Moreover, Defendant Melchor did not indicate that any area of the Residence, including the master bedroom, was off limits to the officers. Furthermore, no evidence was proffered to suggest that Defendant Jose or Defendant Urias had limited Defendant Melchor's access to the master bedroom. *See U.S. v. Baldwin,* 644 F.2d 381, 383 (5th Cir.1981). At a minimum, Defendant Melchor had apparent authority, as the officers reasonably believed that he had authority to give them access to the Residence. Police officers are entitled to rely on the representations of persons regarding their authority to consent when the circumstances do not render such reliance unreasonable. *See Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793. Because Defendant Melchor had the authority to consent to a search of the Residence, including the master bedroom, the cocaine and drug paraphernalia found in the master bedroom are not suppressible.

■ With respect to the contents of the suitcases, however, third party consent is not applicable. Defendant Melchor clearly informed the officers that the two suitcases did not belong to him and that they belonged to Defendant Jose and Defendant Urias. Defendant Melchor's statement that the suitcases belonged to others should have placed the officers on notice that his consent to search did not extend to the luggage. Hence, any reliance on Defendant Melchor's consent was unrea-

sonable. *See Jaras,* 86 F.3d at 390 (passenger whom driver identified as owning the suitcases located in trunk of car did not impliedly consent to search of suitcases, after driver agreed, out of passenger's presence, to permit search of car); *but cf. U.S. v. Richard,* 994 F.2d 244, 250 (5th Cir.1993) (co-occupant of motel room had authority to consent to warrantless search of room including suitcases where no evidence was offered to suggest that nonconsenting codefendant limited access to suitcases).

■ Furthermore, the Court finds that the independent source doctrine is inapplicable to the suppression of the evidence derived from the suitcases.[9] Under the "independent source" doctrine, the challenged evidence will be admissible if the prosecution can show that it was derived from a lawful source independent of the illegal conduct. *See Nix v. Williams,* 467 U.S. 431, 443–44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *U.S. v.Sheppard,* 901 F.2d 1230, 1234 (5th Cir.1990); *see also U.S. v. Houltin,* 566 F.2d 1027, 1030 (5th Cir.1978) ("The second means for 'purging the taint' is discovering the same evidence from an 'independent source.'") (quoting *Silverthorne Lumber Co. v. U.S.,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920)). In such a case, there is no reason to exclude the challenged evidence since the police misconduct is not even a "but for" cause of its discovery. The critical inquiry under the independent source doctrine is whether the challenged evidence was ob-

9. The "independent source" and "inevitable discovery" doctrines are similar but should not be confused. The Court in this Memorandum and Order does not address the inevitable discovery doctrine because the Government fails to offer any theory regarding its applicability. For the inevitable discovery doctrine to apply "the prosecution must demonstrate both a reasonable probability that the evidence would have been discovered in the absence of police misconduct and that the

government was actively pursuing a substantial alternative line of investigation at the time of the constitutional violation." *U.S. v. Cherry,* 759 F.2d 1196, 1205 (5th Cir.1985). The inevitable discovery argument cannot rest upon speculation, but must be supported by historical facts that can be verified or impeached. *See Nix,* 467 U.S. at 444 n. 5, 104 S.Ct. 2501. The Government has failed to sustain its burden of proof that the inevitable discovery doctrine applied in this case.

tained from lawful sources and by lawful means independent of the police misconduct. *See Segura v. U.S.*, 468 U.S. 796, 805, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). The facts in this case do not support this conclusion. In this instance, this exception is inapplicable because the contents of the suitcases were procured as a result of the illegal search and not through independent means. Consequently, the contents of the suitcases should be suppressed.

### 5. Whether stop of van and subsequent detention invalidates statements and evidence acquired at the Residence

■ Defendant Jose and Defendant Urias argue that Officer Vega and the other EPPD officers conducted a pretextual stop of the van and that the officers illegally detained them at the stop scene in violation of their Fourth Amendment Rights in the hope of extracting information from them regarding the ongoing narcotics investigation at the Residence. Specifically, Defendant Jose and Defendant Urias assert that the EPPD officers exceeded the permissible scope for a routine traffic stop involving an improper lane change. Defendant Jose and Defendant Urias contend that the EPPD officers' questions regarding their travel plans and knowledge regarding the Residence did not relate to the basis for the initial stop (the improper lane change violation) and, hence, there were no articulable facts on which to base a reasonable suspicion that Defendant Jose or Defendant Urias was at that time committing a crime or possessing evidence of a crime. Defendant Jose and Defendant Urias contend that their alleged arrest without probable cause invalidates the evidence acquired at the Residence as an immediate and proximate result of that arrest as "fruit of the poisonous tree."

The Court concludes that whether or not the detention of Defendant Jose and Defendant Urias at the stop scene amounted to a *de facto* arrest (an illegal arrest) is ultimately irrelevant because neither the evidence seized from the Residence nor the defendants' post-*Miranda* statements were the products of the alleged post-stop arrest.

> We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'

*Wong Sun v. U.S.*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *see also U.S. v. Ibarra–Sanchez*, 199 F.3d 753, 761 (5th Cir.1999) (even if officers' subsequent show of force, after ordering defendants out of their van during *Terry* stop, amounted to a warrantless arrest, any alleged illegality associated with the "warrantless arrest" was ultimately irrelevant because neither the evidence seized from the van nor the appellants' later statements were a product of the alleged arrest).[10]

---

**10.** In *Ibarra–Sanchez*, the police officers made a felony stop of a van. As the officers approached the vehicle, they smelled an odor of marijuana and decided to conduct a "protective sweep." The officers drew their weapons, ordered the passengers out of the van, handcuffed them, and placed them in the back of the police cars. *See id.* at 757. The defendants argued that the officers' show of force "converted a *Terry* stop based on reasonable suspicion into a full-blown arrest for which the officers had no probable cause." *Id.* at 760–61. The court, however, held that "even if the show of force by the officers constituted an illegal arrest, it would not affect our ultimate disposition because neither

In this case, the cocaine (and other drug paraphernalia) and the post-*Miranda* statements were not obtained by "exploitation" of the allegedly illegal arrest. As discussed above, the physical evidence (excluding the contents of the suitcases) in this case was validly discovered through Defendant Melchor's consent, and are not the "fruits" of the alleged illegal arrest. Hence, there is no reason to suppress the physical evidence.[11]

■ Similarly, the post-*Miranda* statements by Defendant Jose and Defendant Urias should not be suppressed. The post-*Miranda* statements were taken at the Residence after formal arrest based upon the discovery of the cocaine. At that time, Defendant Jose and Defendant Urias were given their *Miranda* warnings by Detective Gutierrez. Although they did not initially respond to the warning, they did respond to Detective Gutierrez's questions regarding the Residence.[12] Defendant Jose and Defendant Urias now contend that they actually asserted, rather than waived, their right to remain silent. They claim that their initial decision not to respond to Detective Gutierrez's questions at the Residence was sufficient indication of their intention to remain silent.

Under the Constitution, any suspect of a crime is guaranteed the rights to assistance of counsel and to remain silent during in-custody police interrogation, and any statement obtained in derogation of those rights is inadmissible in a subsequent criminal prosecution. *See Miranda,* 384 U.S. at 436, 86 S.Ct. 1602. After being advised of his *Miranda* rights, a suspect

may waive those rights and respond to interrogation, provided the waiver is knowingly and intelligently made. *See Moran,* 475 U.S. at 422–23, 106 S.Ct. 1135 ("Once it is determined that [the suspect] . . . at all times knew he could stand mute and request a lawyer, and that he was aware of the state's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."). An express written or oral statement of waiver of the right to remain silent or of the right to counsel would undoubtedly be strong proof of the validity of that waiver, but is not required. *See North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (a valid waiver need not be expressly made; "in some cases waiver of *Miranda* rights can be clearly inferred from the actions and words of the persons interrogated"). However, the Supreme Court cautioned in *Miranda:*

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

384 U.S. at 474, 86 S.Ct. 1602. Moreover, "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Id.* at 475, 86 S.Ct. 1602. This

---

the drugs nor the statements were products of the alleged post-stop arrest."

**11.** Moreover, the Court finds the "independent source" doctrine is applicable to the physical evidence found at the Residence. In this instance, the cocaine and drug paraphernalia were obtained from Defendant Melchor's valid consent, *i.e.* the challenged evi-

dence was obtained from a lawful source and by lawful means independent of the police misconduct. *See* discussion *supra* Part II.B.4.

**12.** According to Detective Gutierrez, Defendant Jose and Defendant Urias each responded "I don't know anything about this house. I don't know what you are talking about." (Tr. 72).

language, however, only dictates that silence cannot lead to a presumption of waiver. It does not say that silence creates a presumption that the suspect desires further interrogation to cease.

"[W]hat the [Supreme] Court sought to interdict in *Miranda* were those situations in which a person has indicated his desire to exercise his constitutional right of silence but the police refuse to take 'no' for an answer. Disregarding his constitutional claim, they continue to ask questions." *Jennings v. U.S.*, 391 F.2d 512, 515 (citing *Miranda*, 384 U.S. at 453, 86 S.Ct. 1602). These techniques, however, were not used in this case. Here, Defendant Jose and Defendant Urias disregarded the *Miranda* warnings—that is, they did not elect to remain silent and spoke to Detective Gutierrez about the crime under investigation. To the extent the momentary silence exhibited by Defendant Jose and Defendant Urias was an invocation of their right

to remain silent, it was an ambiguous one, which allowed Detective Gutierrez to continue questioning them—to determine that they were willing to talk and to use their statements and their silence against them at trial.[13] Except for their initial momentary silence, Defendant Jose and Defendant Urias, without hesitation, responded to Detective Gutierrez's questions regarding the Residence. In light of these facts and the relevant case law,[14] the Court concludes that Defendant Jose and Defendant Urias did not invoke their right to remain silent, and therefore, the police were free to continue questioning them. Accordingly, the post-*Miranda* statements by Defendant Jose and Defendant Urias are also not suppressible.

With respect to the pre-*Miranda* statements made by Defendant Jose and Defendant Urias at the stop scene, the Court finds that the EPPD officers exceeded the

13. The Supreme Court's decision in *Davis v. U.S.*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) casts serious doubt on the rigidity of *Miranda* with respect to ambiguous invocations of the right to remain silent. In *Davis*, the Court held that a suspect's ambiguous assertion of the Fifth Amendment right to counsel does not require the police to stop interrogating him. *See id.* at 461–62, 114 S.Ct. 2350. *Davis*, which restricts the breadth of the *Miranda* holding, dictates that a suspect must unambiguously assert his Sixth Amendment right to counsel, and if a suspect's statement is not an unambiguous or unequivocal request for counsel, officers have no obligation to stop questioning him. *See id.* at 461–62, 114 S.Ct. 2350. Although the Fifth Circuit has yet to address whether the *Davis* standard should be applied to invocations of the right to remain silent, *see Soffar v. Cockrell*, 300 F.3d 588, 594 n. 5 (5th Cir.2002), many other courts have concluded, the reasoning of *Davis* applies equally to ambiguous invocations of the right to remain silent. *See U.S. v. Banks*, 78 F.3d 1190, 1197 (7th Cir. 1996) ("[A]n ambiguous invocation of the right to remain silent does not require that the police cease all questioning."), *rev'd* on other grounds, *Mills v. U.S.*, 519 U.S. 990,

117 S.Ct. 478, 136 L.Ed.2d 373 (1996); *Medina v. Singletary*, 59 F.3d 1095, 1100 (11th Cir.1995) ("Law enforcement officers are not required to terminate an interrogation unless the invocation of the right to remain silent is unambiguous."); *U.S. v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995) ("We consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent.") (citing *U.S. v. Thompson*, 866 F.2d 268, 272 (8th Cir.1989)); *U.S. v. Hurst*, 228 F.3d 751, 759–60 (6th Cir.2000) (citing *Davis* in implicitly holding that a suspect must assert "his right to remain silent sufficiently clearly"); *U.S. v. Ramirez*, 79 F.3d 298, 305 (2d Cir. 1996) (assuming, arguendo, that *Davis* applies to invocations of the right to remain silent, but not holding that it definitely does).

14. Moreover, it is noteworthy that Defendant Jose and Defendant Urias have produced no witnesses putting in question their intellectual endowments, nor have they ever denied that they understood the warnings given them, and while a defendant does not have the obligation to testify himself or to offer evidence, a court cannot make assumptions based upon evidence that is lacking.

allowable scope for a routine traffic stop involving an improper lane change, and therefore any pre-*Miranda* statements should be suppressed.

 An officer may temporarily detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *See U.S. v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Officers must base their reasonable suspicion on "specific and articulable facts," not merely "inarticulate hunches" of wrongdoing. *See U.S. v. Jones*, 234 F.3d 234, 241 (5th Cir.2000); *Ibarra–Sanchez*, 199 F.3d at 758. When reviewing supposedly routine traffic stops, the Court's concern is with the scope of the detention and the degree to which the driver and, concomitantly, the passengers reasonably perceive restraints on their liberty. *See U.S. v. Roberson*, 6 F.3d 1088, 1092 (5th Cir.1993). Although there is no fixed time limit with regard to an investigative detention and will vary to some extent with the particular facts and circumstances of each case, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500, 103 S.Ct. 1319. Moreover, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time." *Id.* Although the length of an investigatory detention is an important factor in determining whether that detention is proper, the Supreme Court has emphasized "the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those pur-

poses." *U.S. v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *see also Place*, 462 U.S. at 709, 103 S.Ct. 2637 ("[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation."). Once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion. *See U.S. v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993). "At that point, continuation of the detention is no longer supported by the facts that justified its initiation." *Id.*

The Fifth Circuit has made it clear that questioning during a traffic violation stop, even on a subject unrelated to the initial purpose of the stop itself, is not a violation of the Fourth Amendment. *See U.S. v. Davis*, 61 F.3d 291, 300 (5th Cir.1995) (police officer's questioning during routine traffic stop, even on subject unrelated to purpose of stop, is not itself a Fourth Amendment violation as mere questioning is neither search nor seizure); *Shabazz*, 993 F.2d at 436 ("[A] police officer's questioning, even on a subject unrelated to the purpose of the stop, is [not] itself a Fourth Amendment violation."); *see also Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("Since *Terry*, we have held repeatedly that mere police questioning does not constitute a seizure."); *but cf. Kelley*, 981 F.2d at 1470 ("under appropriate circumstances, extensive questioning about matters wholly unrelated to the purpose of a routine traffic stop may violate the Fourth Amendment").

In this instance, Officer Vega validly stopped Defendant Jose and Defendant Urias for an improper lane change violation.[15] During the stop, Officer Vega

---

15. The traffic stop for the improper lane change may arguably have been pretextual. However, under *Whren v. U.S.*, a traffic stop, even if pretextual, does not violate the Fourth Amendment if the officer making the stop has "probable cause to believe that a traffic viola-

tion has occurred." 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "This is an objective test based on the facts known to the officer at the time of the stop, not on the motivations of the officer in making the stop."

questioned the vehicle's occupants regarding their travel plans and their knowledge regarding the Residence. Such interrogation, argue Defendant Jose and Defendant Urias, was wholly unrelated to the initial justification for the traffic violation stop for an improper lane change. Moreover, Defendant Jose and Defendant Urias contend that their approximately forty-minute detention was unreasonable under the circumstances and exceeded the scope of the initial stop. The Government, however, argues that the traffic stop was valid and that the EPPD officers had reasonable suspicion to justify the continued detention of the Defendant Jose and Defendant Urias based upon the totality of the circumstances.

The Court agrees with Defendant Jose and Defendant Urias. The Government has not provided the Court with sufficient evidence of articulable, reasonable suspicion, or probable cause authorizing the officers to continue to detain Defendant after the initial stop. Although the initial detention and questioning of Defendant Jose and Defendant Urias was reasonable and certainly permissible under the circumstances, their continued detention pending the outcome of the "knock and talk" exceeded the scope of the initial stop. Moreover, the inconsistent statements about their travel plans and their lack of

knowledge about the Residence do not amount to reasonable suspicion, as the officers at that time had little evidence other than their "hunch" that the Defendants were involved in drug trafficking. *See Jones*, 234 F.3d at 241 (continued detention of driver and passenger, after completion of computer check on drivers' licenses and car rental papers, was not justified by reasonable suspicion of drug trafficking, since defendants' allegedly inconsistent answers with respect to questions surrounding their employment were explained to officer at time of traffic stop, and had nothing to do with drugs); *U.S. v. Dortch*, 199 F.3d 193 (5th Cir.1999) (continued detention of driver to await the arrival of canine unit was unreasonable; and there was no reasonable suspicion of drug trafficking despite the confusion as to the relationship of the defendant to the proper renter of the vehicle). Accordingly, the pre-*Miranda* statements made by Defendant Jose and Defendant Urias should be suppressed.

## III. CONCLUSION

For the reasons stated above, the Court: (1) **DENIES** Defendant Melchor's Motion to Suppress I and Motion to Suppress II; (2) **DENIES** in part and **GRANTS** in part Defendant Urias's Motion to Suppress III; and (3) **DENIES** in part and **GRANTS** in

---

U.S. v. Escalante, *239 F.3d 678, 680–81 (5th Cir.2001). "So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir.1997); see also U.S. v. Causey, 834 F.2d 1179, 1184 (5th Cir.1987) (en banc) ("[W]here police officers are objectively doing what they are legally authorized to do ... the results of their investigations are not to be called in question on the basis of any*

subjective intent with which they acted."). If, however, it is clear that what the police observed did not constitute a violation of the cited traffic law, there is no "objective basis" for the stop, and the stop is illegal. See Escalante, *239 F.3d at 681. Here, Defendant Jose and Defendant Urias do not argue that the initial traffic stop of the vehicle by Officer Vega for improper lane change is not a traffic violation under Texas law. Thus, Defendant Jose and Defendant Urias have failed to show that the initial stop of the vehicle violated the Fourth Amendment.*

part Defendant Jose's Motion to Suppress

IV.

**IT IS SO ORDERED.**